**CITY OF DUBLIN et al.**

v.

**The STATE of Ohio.**

2002-Ohio-2431.]

Court of Common Pleas of Ohio,
Franklin County.

No. 99CVH–08–7007.

Decided April 1, 2002.

20

22

**28**

Steven Smith, John Gilligan, Daniel Anderson and John C. McDonald, for plaintiff city of Dublin.

Sharon Hunter Pfancuff, for plaintiff city of Upper Arlington.

Betty D. Montgomery, Attorney General, Elizabeth Luper Schuster and Judith L. French, Assistant Attorneys General, for defendant state of Ohio.

DANIEL T. HOGAN, Judge.

## Introduction

{¶ 1} Plaintiffs, the cities of Upper Arlington and Dublin, seek a declaration that R.C. Chapter 4939 ("Chapter 4939") is unconstitutional. It was enacted as a rider on an 855–page biennial appropriations bill. Chapter 4939 defines "public ways" so as to include any "public street, road, highway, public easement, or public waterway," including "the entire width of any right of way associated with the public way." Chapter 4939 then limits the extent to which any political subdivision can control the use of its own public ways by "utility service providers" and "cable operators," including (1) requiring restoration of public ways to the same material condition they were in prior to installation of utility and cable lines and equipment, (2) recovering full compensation from any cable operator or utility service provider who fails to do so, (3) charging a reasonable fee for the use of the political subdivision's public way property by such

commercial enterprises, (4) protecting public ways from becoming lumpy strips of patchwork tar and asphalt, under a vast network of overhead wires, lined by utility, telephone, and wireless phone poles, not to mention sheds, fenced-off utility compounds, switch boxes, satellite receivers, and any other new eyesore that next year's technology, or clever opportunism, might devise, and (5) creating an organized, efficient system for installation and location of equipment that might enhance life in the municipality rather than harm it, and attract commercial development without imposing unreasonable expenses upon utility service providers and cable operators. The parties might disagree about the extent to which Chapter 4939 restricts pursuit of the latter two goals, but it is clear that Chapter 4939 is explicitly intended to restrict local power to control the use of municipal streets, and, hence, it is beyond reasonable doubt that Chapter 4939 limits, at least to some degree, a municipality's ability to pursue those goals.

{¶ 2} Plaintiffs allege that Chapter 4939 is unconstitutional since (1) it deprives municipalities of their home rule powers under the Ohio Constitution, (2) its enactment violated the "one subject" requirement of the Ohio Constitution, (3) it does not operate uniformly across the state as required by the Ohio Constitution, and (4) it "takes" the property of Ohio municipalities without just compensation in violation of the Ohio and United States Constitutions. Plaintiffs' summary judgment motion seeks summary judgment based on the first three of those grounds.

### The Single–Subject Rule

{¶ 3} Section 15(D), Article II of the Ohio Constitution provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title." The Cuyahoga County Court of Appeals has already been asked to decide whether the enactment of Chapter 4939 violated that requirement. The majority declined to decide the issue. However, Judge Kilbane, in her concurring opinion, argued that there was a need to resolve the constitutional issue in order to decide the case and proceeded to find that the enactment of Chapter 4939 violated the Single–Subject Rule. She wrote:

{¶ 4} "R.C. Chapter 4939, consisting of four sections, was enacted in 1999 as part of the General Assembly's Biennial Operating Appropriations legislation. It deals with the restrictions and licensing requirements political subdivisions may place upon any utility or cable provider within that subdivision. That portion of the act, which also repealed R.C. 4931.01, .03, .20, .23, and .24, does not have any relationship with the State budget, the allotment of state funds or the organization of state agencies, which are the subjects of the super-majority of the 855-page bill. R.C. Chapter 4939 can be fairly characterized as a special law, an unconnected ride[r] improperly included in the bill, and must be invalidated."

*The Payphone Assn. of Ohio v. Cleveland* (2001), 146 Ohio App.3d 319, 766 N.E.2d 167 (Kilbane, J., concurring).

{¶ 5} For the reasons that follow, this court agrees with Judge Kilbane.

{¶ 6} The Ohio Supreme Court has recently reviewed the rationale for the single-subject requirement:

{¶ 7} "[O]ne delegate to the Constitutional Convention of 1851 remarked:

{¶ 8} " 'It is well known that special charters are always "got through" our Legislature at will, and it must be evident that it always will be so, in the absence of a constitutional prohibition. When was there ever an instance within the recollection of the oldest legislator on this floor, where a single special act of incorporation was defeated—I mean an act applying to any subject matter embraced in this report. * * * It is but too generally known, that these "special acts" are "got through" by a log-rolling system as it is called, the friends of one "bill" voting for the bills of others, in consideration of their aid, when the final vote is taken upon his own. These acts will always pass a legislative body—the "dignity" and "purity" of your General Assembly to the contrary, notwithstanding. Any association of capitalists, who ask for a right of way, through any part of the country, will always get it, and ten thousand remonstrances might be sent up in vain. A single member could carry it through the Legislature, if each other member had had a bill of his own for similar acts of [incorporation].' I Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio (1851) 351.

{¶ 9} "One commentator, writing approximately sixty years later, identified the above quote as 'an illuminating exposition of the devious ways of legislatures sixty years ago.' Galbreath, Constitutional Conventions of Ohio (1911) 27.

{¶ 10} "Thus, as we explained in *Dix, supra*, 11 Ohio St.3d at 142–143, 11 OBR at 438, 464 N.E.2d at 155:

{¶ 11} " 'Ohio is one of among forty-one states whose Constitution contains a one-subject provision. The primary and universally recognized purpose of such provisions is to prevent logrolling— " * * * the practice of several minorities combining their several proposals as different provisions of a single bill and thus consolidating their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal of each minority could have obtained majority approval separately." * * *

{¶ 12} " 'The one-subject provision attacks logrolling by disallowing unnatural combinations of provisions in acts, *i.e.*, those dealing with more than one subject, on the theory that the best explanation for the unnatural combination is a tactical one—logrolling. By limiting each bill to a single subject, the bill will have unity and thus the purpose of the provision will be satisfied.' " *State ex rel. Ohio*

*Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 495–496, 715 N.E.2d 1062.

{¶ 13} The court went on to discuss the standards for applying the single-subject rule:

{¶ 14} "In attempting to define our role in the enforcement of the one-subject provision of Section 15(D), Article II of the Ohio Constitution, this court has been emphatic about its reluctance to interfere or become entangled with the legislative process. We have endeavored to 'accord appropriate respect to the General Assembly, a coordinate branch of the state government.' *Dix, supra*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. In so doing, we have recognized 'the necessity of giving the General Assembly great latitude in enacting comprehensive legislation by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject.' *Id.* at 145, 11 OBR at 440, 464 N.E.2d at 157. We have emphasized that 'every presumption in favor of the enactment's validity should be indulged.' *Hoover v. Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580, and noted that 'while this provision has been invoked in hundreds of cases in various jurisdictions,' * * * in only a handful of cases have the courts held an act to embrace more than one subject." ' *Dix*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157, quoting Ruud, 'No Law Shall Embrace More Than One Subject' (1958), 42 Minn.L.Rev. 389, 447.

{¶ 15} "On the other hand, we have been equally emphatic about not extending this reluctance to impede the legislative process so far as to negate the one-subject provision of Section 15(D), Article II of the Ohio Constitution. 'While this court has consistently expressed its reluctance to interfere with the legislative process, it will not, however, abdicate in its duty to enforce the Ohio Constitution.' *Dix*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. See, also, *Ohio AFL–CIO v. Voinovich, supra*, 69 Ohio St.3d at 229, 631 N.E.2d at 586.

{¶ 16} "With these principles in mind, we have adopted the position that 'the one-subject provision is not directed at plurality but at disunity in subject matter.' *Dix*, 11 Ohio St.3d at 146, 11 OBR at 440–441, 464 N.E.2d at 158. See, also, *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 148, 580 N.E.2d 767, 770. Thus, 'the mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics.' *Hoover, supra*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580; *Ohio AFL–CIO, supra*, 69 Ohio St.3d at 229, 631 N.E.2d at 586. However, 'when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or

legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.,* logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purpose of the rule.' *Dix,* 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157. See, also, *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 507; *Hinkle, supra,* 62 Ohio St.3d at 148–149, 580 N.E.2d at 770; *Hoover, supra,* 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580." Id.

{¶ 17} In *Simmons–Harris v. Goff* (1999), 86 Ohio St.3d 1, 711 N.E.2d 203, the Ohio Supreme Court said:

{¶ 18} "We recognize that appropriations bills, like Am.Sub.H.B. No. 117, are different from other Acts of the General Assembly. Appropriations bills, of necessity, encompass many items, all bound by the thread of appropriations."

{¶ 19} Defendant argues that the court was indicating a willingness to be more lenient in its application of the Single–Subject Rule to appropriations bills. The argument is unpersuasive. The court offered this statement, not as an expression of a willingness to be more lenient, but rather as an explanation of why it would not evaluate the constitutionality of the entire bill, but would limit its analysis to the portion at issue in the case.

{¶ 20} While the statement may indicate a willingness to allow all state appropriation items in a single biennial appropriations bill, the different treatment due to appropriations bills would also involve added caution when considering non-appropriation riders to appropriations bills. In the process of creating a budget, the thread of appropriations necessarily binds the various aspects of the budget, including a vast array of appropriations. However, the very fact that such a budgetary need justifies inclusion of many diverse appropriations in an appropriations bill increases the need to exercise caution to avoid violating the single-subject rule by adding still more diverse items to the bill that are not so necessarily connected to creating a budget. With so many diverse items already included in the bill, it becomes increasingly incredible that non-appropriation items can be added to the bill without violating the single-subject rule. Hence, in *Simmons–Harris,* the Ohio Supreme Court said:

{¶ 21} "Riders are provisions that are included in a bill that is ' "so certain of adoption that the rider will secure adoption not on its own merits, but on [the merits of] the measure to which it is attached." ' *Dix,* 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156, quoting Ruud, 'No Law Shall Embrace More Than One Subject' (1958), 42 Minn.L.Rev. 389, 391. Riders were one of the problems the *Dix* court was concerned about. *Id.* The danger of riders is particularly evident when a bill as important and likely of passage as an

appropriations bill is at issue. See Ruud at 413 ('The general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage')."

{¶ 22} Hence, consideration of the differences inherent in appropriation bills does not necessarily lead to greater leniency when applying the single-subject rule to non-appropriation riders. To the contrary, those differences create a need for caution when considering the appropriateness of including such non-appropriation riders in an appropriations bill.

{¶ 23} In any event, *Simmons–Harris*, like the current case, involved application of the single-subject rule to a biennial appropriations bill. Hence, in the absence of any reason to deviate from the analysis used in that case, the current case should receive a similar analysis.

{¶ 24} In *Simmons–Harris*, the legislature had enacted provisions creating a school voucher program by including them as a rider in a biennial appropriations bill. The court considered three factors and determined that inclusion of the school voucher provisions in the biennial appropriations bill violated the single-subject rule. The same factors are present in the current case. This court has not been shown, and is unaware of, any significant factors involved in the current case that could reasonably lead to a different conclusion in this case than in *Simmons–Harris*.

{¶ 25} In *Simmons–Harris*, the court said:

{¶ 26} "The School Voucher Program allows parents and students to receive funds ·from the state and expend them on education at nonpublic schools, including sectarian schools. It is a significant, substantive program. Nevertheless, the School Voucher Program was created in a general appropriations bill consisting of over one thousand pages, of which it comprised only ten pages. See 146 Ohio Laws, Part I, 898–1970. The School Voucher Program, which is leading-edge legislation, was in essence little more than a rider attached to an appropriations bill."

{¶ 27} Similarly, in the current case, Chapter 4939 includes significant, substantive regulations that would regulate the legislative conduct of municipalities and other political subdivisions with regard to utilities and cable operators. It is leading-edge legislation targeted at controlling how municipalities and other political subdivisions can respond to the radical change in the provision of utility and cable services as Ohio and the nation shifts from a small, controlled number of publicly franchised utility and cable monopolies to an uncontrolled number of competing utility and cable companies of varying size, reliability, and stability, all of whom desire to occupy our streets, waterways, and other public ways with their lines, poles, pipes, and other equipment. Nevertheless, similar to *Sim-*

*mons–Harris,* Chapter 4939 was enacted in an 855–page bill of which it comprised only a few pages, so that it was, like the school voucher provisions in *Simmons–Harris,* "in essence little more than a rider attached to an appropriations bill." In this regard, the current case is directly parallel to *Simmons–Harris.*

{¶ 28} Regarding the second factor considered in *Simmons–Harris,* the court said:

{¶ 29} "Another significant aspect of the one-subject rule, according to the *Dix* court, is that 'by limiting each bill to one subject, the issues presented can be better grasped and more intelligently ·discussed.' *Dix,* 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156. This principle is particularly relevant when the subject matter is inherently controversial and of significant constitutional importance."

{¶ 30} Likewise, in the current case, the subject matter is inherently controversial and of significant constitutional importance. There is clearly a constitutional issue as to whether the attempt to deprive municipalities of their powers with regard to regulating the use of their own public ways, including charging a reasonable fee for such use, violates the Home Rule Amendment to the Ohio Constitution. Furthermore, the limitation of municipal powers to protect municipal public ways without the introduction of any new method for protecting those municipal assets is inherently controversial. The Ohio Supreme Court has said, "The streets and alleys of a municipality are what the arteries and veins are to a man." *Perrysburg v. Ridgway* (1923), 108 Ohio St. 245, 140 N.E. 595. In other words, protection of municipal public ways is vitally significant to the municipalities in which they are located. Furthermore, the Ohio Supreme Court has also said, "[T]he appearance of a community relates closely to its citizen's happiness, comfort and general well-being." *Hudson v. Albrecht* (1984), 9 Ohio St.3d 69, 9 OBR 273, 458 N.E.2d 852. Given (1) that Chapter 4939 at least creates an issue as to whether municipalities will retain their vitally significant powers to protect their municipal public ways, and (2) the potentially devastating impact that Chapter 4939 could have on the appearance of Ohio's communities, it is clear that Chapter 4939 is inherently controversial legislation. Thus, as in *Simmons–Harris,* the legislation at issue in this case is "inherently controversial and of significant constitutional importance." Again in this regard, the current case is directly parallel to *Simmons–Harris.*

{¶ 31} Regarding the final factor considered in *Simmons–Harris,* the court said:

{¶ 32} "This court has stated 'the mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics. However, where there is a blatant disunity between topics and no

rational reason for their combination can be discerned, it may be inferred that the bill is the result of logrolling * * *.' *Hoover*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580. As discussed previously, there is a 'blatant disunity between' the School Voucher Program and most other items contained in Am.Sub.H.B. No. 117. Further, we have been given 'no rational reason for their combination,' which strongly suggests that the inclusion of the School Voucher Program within Am.Sub.H.B. No. 117 was for tactical reasons. *Dix*, 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157."

{¶ 33} Similar to *Simmons–Harris*, there is blatant disunity between Chapter 4939 and most other topics in the bill. In *Simmons–Harris*, the court analyzed the disunity issue as follows:

{¶ 34} "The first provision of Am.Sub.H.B. No. 117, as enacted, R.C. 3.15, concerns the residency of certain elected officials. Baldwin's Ohio Legislative Service (1995) L–622. The second provision, R.C. 9.06, which enables certain government entities to contract for the private operation of correctional facilities, is not related to the first provision. 146 Ohio Laws, Part I, 906. The third provision, R.C. 101.34, which declares some files of the joint legislative ethics committee to be confidential, is not related to either of the first two provisions. Id. at 911. The fourth provision, R.C. 102.02, which requires candidates for elective office to file financial statements with the Ethics Commission, is not related to any of the first three provisions. Id. at 913. The fifth provision, R.C. 103.31, which creates a joint legislative committee on federal funds, and the sixth provision, R.C. 103.32, which requires certain state agencies to submit proposals to that committee, are not related to any of the first four provisions. Id. at 920–921. It is obvious that none of the first six provisions of Am.Sub.H.B. No. 117 has anything to do with the School Voucher Program. Am.Sub.H.B. No. 117 contains many other examples of topics that 'lack a common purpose or relationship.' Am.Sub.H.B. No. 117 contained three hundred eighty-three amendments in twenty-five different titles of the Revised Code, ten amendments to renumber, and eighty-one new sections in sixteen different titles of the Revised Code. Baldwin's Ohio Legislative Service (1995) L–621–622."

{¶ 35} Following the same mode of analysis, consider the following nonexhaustive sample of the diversity of subject matter found in the bill:

{¶ 36} R.C. 9.06 was amended to create additional requirements for private contractors operating prisons in Ohio.

{¶ 37} R.C. 101.30 was enacted imposing a duty of confidentiality on legislative staff and denying public records status to certain documents arising out of that relationship.

{¶ 38} R.C. 102.02 was amended to clarify which receipts the Ohio Ethics Commission is required to deposit into the Ohio ethics commission fund.

{¶ 39} R.C. 103.43 was amended to add an exception to the legislative budget office's duty to compile local impact statements for legislation passed by the General Assembly.

{¶ 40} R.C. 1321.57 was amended to allow lenders to charge an alternative prepayment penalty on loans secured by an interest in real estate.

{¶ 41} R.C. 2151.55 and R.C. 2151.551 were enacted to require certain communications under certain circumstances to an intended foster care giver and the local school board in advance of an intended placement of a child in a foster care setting.

{¶ 42} R.C. 3734.02 was amended to empower the director of environmental protection to create an alternative system for authorizing solid waste compost facilities.

{¶ 43} As in *Simmons–Harris*, it is obvious that none of these provisions is related to each other or has anything to do with the regulation of public right-of-way use by utility companies and cable operators. Furthermore, the bill included amendments to approximately 350 sections of the Revised Code in approximately 26 different titles, and enacted approximately 105 new sections in approximately 13 different titles. Clearly, the bill in which Chapter 4939 was enacted has exactly the same kind of blatant disunity as the bill at issue in *Simmons–Harris*.

{¶ 44} In *Simmons–Harris*, the court found that it had been given " 'no rational reason for their combination,' which strongly suggests that the inclusion of the School Voucher Program within Am.Sub.H.B. No. 117 was for tactical reasons." Since the court had been given a reason for the combination (that the appropriations bill at issue included an appropriation for the school voucher program) its finding was that the reason was not rational in light of the other factors it had considered.

{¶ 45} This court finds that the reason offered in this case is no more rational than the reason that the Ohio Supreme Court rejected in *Simmons–Harris*. Defendant argues that one of the provisions in Chapter 4939 would prevent some municipalities from collecting revenue from utility companies and cable operators in return for use of municipal rights-of-way. It would prevent other municipalities from increasing their fees for such use of their rights-of-way. Defendant argues that these provisions are related to the rest of the appropriations bill because the bill includes appropriations for municipalities.

{¶ 46} The relation between Chapter 4939 and the rest of the appropriations bill in which it was enacted is even more tenuous than the connection between the school voucher program and the appropriations bill in which the school voucher

program was enacted. At least the appropriation in the *Simmons–Harris* case was explicitly for the purpose of funding the school voucher program. Here there is no explicit connection between the appropriations provided for municipalities and the loss of potential revenues (or damage to public rights-of-way) caused by Chapter 4939. The state identifies three appropriations to municipalities: "The Local Government Revenue Assistance Fund, the Local Government Fund, and the State Local Government Fund."[1] None of these funds is designated in the bill as providing compensation for Chapter 4939 losses. Rather, these are all funds with much more general purposes so that there would have been appropriations regardless of whether Chapter 4939 was enacted. Furthermore, it is somewhat doubtful that those appropriations were intended as compensation for potential lost revenues caused by Chapter 4939, since no provision is made whereby the amounts that would be received by different municipalities would be proportionate to their specific losses as a result of Chapter 4939. One example of such a difference in potential losses is the different potential losses of different municipalities under Chapter 4939 because some municipalities are treated more favorably than others.

{¶ 47} In all remaining respects, defendant's proffered reason is no stronger than the reason proffered and rejected in *Simmons–Harris*. As already discussed above, the same factors which the Supreme Court relied upon in finding that the proffered reason was not rational are also present in this case. Chapter 4939, having blatant disunity with the rest of the bill, was enacted as a mere rider on an appropriations bill in spite of its being leading-edge legislation that was inherently controversial and of significant constitutional importance. This court sees no reason to distinguish appropriations such as those found in *Simmons–Harris*, designed to fund scholarships, from appropriations to municipalities, which might be loosely conceived as compensating municipalities for lost potential revenues and damage to their rights-of-way. Clearly, this difference in no way evidences a reduced likelihood that logrolling was involved. To the contrary, the tenuousness of the argument, that the appropriations made to municipalities were meant to compensate municipalities for lost revenues and costs caused by Chapter 4939, makes the likelihood that logrolling was involved even greater in this case than it was in *Simmons–Harris*.

{¶ 48} Defendant cites *Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153, and *ComTech Sys., Inc. v. Limbach* (1991), 59 Ohio St.3d 96, 570

---

1. Defendant does not provide a citation. Presumably, defendant is referring to three appropriations in Section 88 of the bill (page 812). If so, the "State Local Government Fund" that defendant refers to is actually the State/Local Government Highway Distribution Fund. Our review of the 855-page bill has not uncovered any reference to a "State Local Government Fund."

N.E.2d 1089, in support of its argument that there was a rational reason for including the Chapter 4939 right-of-way provisions in the biennial appropriations bill. The argument is not persuasive, because those cases are significantly distinguishable. *Simmons–Harris* is much more analogous to the current case.

{¶ 49} In *Dix*, a former appointee, who had lost his position in the reorganization of the state's economic assistance development programs, challenged the statute which set forth the reorganization and included a small number of relevant appropriations. The former appointee argued that inclusion of the reorganization and appropriations in the same bill violated the single-subject rule. The court disagreed and found that the appropriations were "simply the means by which the act is carried out." The purpose of the Act was the administrative reorganization. The appropriations served that reorganization by providing funding for the reorganized agencies. The bill at issue was not a biennial budget bill, as in the current case, wherein the purpose of the bill is to make appropriations for state government operations. Chapter 4939, which grants certain rights to utility companies and cable operators to occupy public rights of way, and attempts to limit the power of municipalities to regulate the use of their rights of way by such users, and to charge fees for such uses, does not serve the purpose of making appropriations for state government operations. It would be inconsistent with *Simmons–Harris* to construe *Dix* broadly as entailing that any substantive regulation or program can be added to a biennial appropriations bill so long as there is some appropriation in the bill that somehow relates to the program or regulation. Given the very wide variety of appropriations and potential appropriations in a biennial appropriations bill, such a reading of *Dix* would render the single-subject rule meaningless and useless as a means of preventing logrolling.

{¶ 50} *Dix* is also distinguishable from the current case in that it lacks the factors that were identified as significant in *Simmons–Harris*. The bill in *Dix* was not a biennial appropriations bill. As noted in *Simmons–Harris*, such bills are especially susceptible to the attachment of riders that can then pass independently of their own merits. Furthermore, unlike the current case or *Simmons–Harris*, *Dix* did not involve a rider that presented important constitutional questions or inherently controversial matters in need of independent consideration. Finally, there was no blatant disunity between the various parts of the bill in *Dix*. The bill concerned only a few titles of the Revised Code and was a mere 72 pages as compared to the 855–page bill in the current case or the bill in *Simmons–Harris* that exceeded 1,000 pages.

{¶ 51} *ComTech* involved the inclusion of a new tax in the 1983 biennial

appropriations bill.[2] Unlike Chapter 4939, which does not serve the purpose of funding state government operations, the tax at issue in *ComTech* did serve the purpose of the biennial budget bill in which it was included. It provided funding for state government operations by funding appropriations made in that bill. Once again, it would be inconsistent with *Simmons–Harris* to construe *ComTech* broadly as entailing that any substantive regulation or program can be added to a biennial appropriations bill so long as there is some appropriation in the bill that somehow relates to the program or regulation. Given the very wide variety of appropriations and potential appropriations in a biennial appropriations bill, such a reading of *ComTech* would render the single-subject rule meaningless and useless as a means of preventing logrolling.

{¶ 52} *ComTech* is also distinguishable from the current case in that it lacks some of the factors that were identified as significant in *Simmons–Harris*. No rider was involved in *ComTech* that presented important constitutional questions in need of independent consideration. Furthermore, there was no blatant disunity between the various parts of the bill in *ComTech*.

{¶ 53} In any event, *Simmons–Harris* is more directly on point. Furthermore, to the extent that *Dix* and *ComTech* might imply a different analysis than *Simmons–Harris*, the latter is the more recent case and is therefore controlling.

{¶ 54} Consequently, in accordance with *Simmons–Harris*, and in agreement with Judge Kilbane's concurrence in *The Payphone Assn. of Ohio v. Cleveland*, supra, this court finds, beyond a reasonable doubt, that Chapter 4939 is unconstitutional because it was enacted in violation of the single-subject rule of the Ohio Constitution.

## Uniformity Clause

{¶ 55} Plaintiffs argue that parts of Chapter 4939 violate Section 26, Article II of the Ohio Constitution, the Uniformity Clause, which states that "all laws of a general nature, shall have a uniform operation throughout the state." The provisions which are alleged to violate the Uniformity Clause are R.C. 4939.03(A) and 4939.04. R.C. 4939.03(A) says:

{¶ 56} "A political subdivision of the state shall not levy a tax, fee, or charge or require any non-monetary compensation or free service for the right or privilege of using or occupying a public way for purposes of delivering natural gas, electric, telecommunications, or cable television service."

---

**2.** Biennial appropriations bills have grown since then. The 1983 bill was 510 pages. Although this court does not rely upon that difference, it should be noted that the added length increases the likelihood that inherently controversial or constitutionally important riders will be passed without being given due consideration.

{¶ 57} R.C. 4939.04 says:

{¶ 58} "Division (A) of section 4939.03 of the Revised Code does not apply to, or otherwise affect, any legal requirement of a political subdivision for the right or privilege of using or occupying a public way, which requirement took effect on or before December 31, 1998.

{¶ 59} " * * *

{¶ 60} "This section does not apply to any subsequent amendment of such a requirement, or any additional requirement, that takes effect after December 31, 1998."

{¶ 61} The effect of these two sections is that different municipalities will be treated differently depending upon whether a municipality already had a fee structure which took effect on or before December 31, 1998. The issue here is whether that different treatment amounts to a violation of the Uniformity Clause.

■ {¶ 62} The constitutionality of legislation under the Uniformity Clause is determined by the application of a two-part test: (1) whether the statute is a law of a general or special nature, and (2) whether the statute operates uniformly throughout the state. *Desenco, Inc. v. Akron* (1999), 84 Ohio St.3d 535, 706 N.E.2d 323.

■ {¶ 63} So the first question that must be considered is whether the relevant provisions of Chapter 4939 are laws of a general or special nature. If the subject matter of the legislation does or could come to exist in, and affect the people of, every county in the state, it is of a general nature. *Desenco, Inc.,* supra, at 542, 706 N.E.2d 323. The use of public ways by utility companies and cable operators exists in every county of this state and the charging of fees by political subdivisions exists, or could come to exist, in every county of the state. Hence, at least under the analysis, which is proper for the Uniformity Clause, R.C. 4939.03(A) and 4939.04 are general laws.

{¶ 64} Moving to the second stage of the test, it must now be asked whether those statutory provisions have uniform application across the state. The standards for answering that question have been described in *Desenco:*

{¶ 65} "Section 26, Art. II of the Constitution was not intended to render invalid every law which does not operate upon all persons, property or political subdivisions within the state. It is sufficient if a law operates upon every person included within its operative provisions, provided such operative provisions are not arbitrarily and unnecessarily restricted. And the law is equally valid if it contains provisions which permit it to operate upon every locality where certain specified conditions prevail. 'A law operates as an unreasonable classification

where it seeks to create artificial distinctions where no real distinction exists.' Id., 109 Ohio St. at 385, 142 N.E. at 401.

{¶ 66} "The *Stanton* court considered the uniformity of operation of a statute that by its terms applied only to those counties with two or more common pleas judges where, at the time, the majority of the counties in Ohio had only one common pleas judge. The court held that even though the statute at issue in that case could apply only to certain counties, nothing prevented application of the statute to a county that, *in the future*, adds a judge to its common pleas bench. Id. at 385, 142 N.E. at 401. Similarly, in *Zupancic*, this court considered a statute that classified taxing districts into those containing an electric company plant having production equipment with an initial cost exceeding $ 1 billion and those containing a plant having such property under that amount. At the time, only one $ 1 billion plant existed. The court held the statute to operate uniformly because nothing in the statute prevented its *prospective* application, however unlikely, to any taxing district in which a plant is built having production equipment with an initial cost exceeding $ 1 billion. The *Zupancic* court stated:

{¶ 67} " '[A] statute is deemed to be uniform despite applying to only one case so long as its terms are uniform and it may apply to cases similarly situated in the future. See *State, ex rel. Core, v. Green* (1953), 160 Ohio St. 175, 183, 51 O.O. 442, 445, 115 N.E.2d 157, 161–162; *Miller v. Korns* [(1923)], *supra* [107 Ohio St. 287], at 295, 140 N.E. [773] at 775.' [*State ex rel.*] *Zupancic* [*v. Limbach* (1991)], 58 Ohio St.3d [130] at 138, 568 N.E.2d [1206] at 1213." *Desenco* at 542– 543, 706 N.E.2d 323.

{¶ 68} This description of the standards to be applied leaves unanswered a legal issue which is relevant to the current case. What happens if a statute is prevented from prospective application as to certain locations in the state because of a characteristic they had on a certain date, when such restriction is neither arbitrary nor unnecessary, and, hence, does not function as an "unreasonable classification creating artificial distinctions where no real distinction exists"? The Supreme Court has noted that it has invalidated legislation as violating the Uniformity Clause when the legislation does not allow for future application. Id. at 543, 706 N.E.2d 323, fn. 3. However, in order for the standard set forth in *Desenco* to be consistent, operative provisions preventing future application violate the Uniformity Clause only if they are arbitrary and unnecessary. That is the only way to remain consistent with the statement in *Desenco* that says, "It is sufficient if a law operates upon every person included within its operative provisions, provided such operative provisions are not arbitrarily and unnecessarily restricted." Id. at 542, 706 N.E.2d 323. Reviewing the cases in which the Supreme Court invalidated legislation as violating the Uniformity Clause because the legislation did not allow for future application, this court finds that the

restrictions in those cases that prevented future application were arbitrary and unnecessarily restrictive. In *Simmons–Harris,* the school voucher program was created for these school districts, which had been subject to a federal court order requiring state supervision as of a certain date in the past. Even though the court noted that it was reasonable at the time to single out the Cleveland school district for the school voucher program, it was arbitrary and unnecessarily restrictive not to allow future application to some other school district if that other school district came to share the characteristic of being under a similar federal court order. In *Dayton Fraternal Order of Police Lodge No. 44 v. State Emp. Relations Bd.* (1986), 22 Ohio St.3d 1, 22 OBR 1, 488 N.E.2d 181, the court explicitly said that different treatment of certain Dayton policemen and firefighters because they had previously been determined to be "supervisors" was arbitrary. Likewise, in *Garcia v. Siffrin Residential Assn.* (1980), 63 Ohio St.2d 259, 17 O.O.3d 167, 407 N.E.2d 1369, the court explicitly found that the classification of municipalities based upon whether they permitted licensed residential facilities as of a certain date in the past was arbitrary.

{¶ 69} It appears that only in *Put–In–Bay Island Taxing Dist. Auth. v. Colonial, Inc.* (1992), 65 Ohio St.3d 449, 605 N.E.2d 21, did the court fail to ask whether legislation that treated different localities differently was based upon an arbitrary or unreasonable classification. In that case, the legislature had created island-taxing districts wherein those districts were allowed to collect a tax, which could not be collected in other localities around the state. The court of appeals found that there was no violation of the Constitution because islands have unequal conditions that the statute sought to deal with in a rational manner. The Supreme Court reversed, based upon a finding that the "statutory scheme applies only to a territorially limited class of vendors in Ohio" and "does not have the potential to apply throughout the state." The Supreme Court apparently did not regard it as necessary to determine whether it was reasonable to authorize imposition of the new tax only in island districts. Such an analysis appears to this court to be inconsistent with the statement quoted earlier from *Desenco:* "It is sufficient if a law operates upon every person included within its operative provisions, provided such operative provisions are not arbitrarily and unnecessarily restricted." Since *Desenco* is the more recent, unanimous decision of the Ohio Supreme Court, it is binding upon this court. Hence, this court concludes that legislation may treat different locations differently based upon differences that existed on some past date if and only if it is reasonable and nonarbitrary to do so.

{¶ 70} This court finds that the classification of political subdivisions in R.C. 4939.03(A) and 4939.04 is reasonable and nonarbitrary. The legislature wanted to limit the collection of fees by political subdivisions from utilities and cable operators for their use of public ways. However, the legislature also realized

that a total prohibition of such fees would work a special hardship upon political subdivisions that already charge such fees, and, hence, had already developed reliance upon receipt of such fees. Hence, the legislature permitted such political subdivisions to continue charging such fees while prohibiting any increase in those fees. Given inflation, the effect of the exception is to gently wean political subdivisions that had developed reliance upon such fees from such reliance. This court finds that it was reasonable for the legislature to treat subdivisions differently based upon whether they were already charging fees on some date shortly before enactment of the legislation.

{¶ 71} There are reasons why it is often unreasonable and arbitrary to draft legislation so that it will never apply in certain locations of the state. So with regard to the legislation in *Simmons–Harris*, it is unreasonable and arbitrary to provide for a voucher program in the Cleveland school district because it has come under a federal court order while failing to provide that any such program will also be available for any other district that should happen to come under a similar federal court order. However, by contrast, it is not unreasonable or arbitrary to provide an exception to the R.C. 4939.03(A) no-fee rule for those political subdivisions that already rely upon such fees while not providing an exception for political subdivisions that might develop such reliance in the future. This is because no political subdivision could develop such reliance in the future except by violating or otherwise ignoring the R.C. 4939.03(A) no-fee rule.

{¶ 72} For the above-stated reasons, this court hereby declares that R.C. 4939.03(A) and R.C. 4939.04 do not violate the Uniformity Clause of the Ohio Constitution.

### Home Rule

#### 1. Introduction

{¶ 73} Plaintiffs have asked this court to determine whether Chapter 4939 violates the Home Rule Amendment to the Ohio Constitution. Chapter 4939 purports to limit the extent to which municipalities can regulate the access of "utility service providers"[3] and "cable operators"[4] to "public ways" in Ohio for the purpose of installing their utility and cable equipment and facilities. "Public ways" are defined as "any public street, road, highway, public easement, or public

---

**3.** R.C. 4939.01(A): " 'Utility service provider' means a natural gas company, local exchange telephone company, interexchange telecommunications company, electric company, or any other person that occupies a public way to deliver natural gas, electric, or telecommunications services."

**4.** R.C. 4939.01(B): " 'Cable operator' has the same meaning as in section 2 of the 'Cable Communications Policy Act of 1984,' 98 Stat. 2779, 47 U.S.C.A. 522, as amended."

waterway, and includes the entire width of any right of way associated with any public way." In the past, municipalities have exercised considerable control over the conditions for installation of such equipment and facilities, especially with regard to equipment and facilities for service within the municipality. Even when intercity or interstate power lines were involved, as in *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 44 O.O.2d 121, 239 N.E.2d 75, the Ohio Supreme Court has noted that municipalities had the power to establish reasonable conditions for installation in order to ensure that such lines do not interfere with city planning to such an extent as to affect the general welfare of municipal inhabitants. Chapter 4939 appears to go much farther than the statute in *Painesville.* Its restriction upon municipal power is not limited to municipal regulation of intercity and interstate high voltage power lines, but would limit (or, arguably, entirely prohibit) municipal regulation of installation of any cable or utility equipment and facilities within public ways even when the purpose of such equipment and facilities would only be used for providing cable or utility services within the municipality.

{¶ 74} At issue in this case is the nature and extent of municipal powers granted by the Home Rule Amendment to the Ohio Constitution, the extent to which those powers include the power to control access to public ways by utility service providers and cable operators, and whether Chapter 4939 would limit those constitutionally based municipal powers in ways not authorized by the Ohio Constitution.

## 2. Historical background and rationale for the Home Rule Amendment

{¶ 75} The dignity and power of Ohio's municipalities under the "Home Rule" provision of the Ohio Constitution should not be underestimated. In Ohio, a municipal government is not merely a local agent of the state government. Rather, perhaps even more clearly than in the United States Constitution, there is a sphere of constitutionally granted local power within which the local (in this case municipal) authority is supreme. As stated by the Ohio Supreme Court, "The power of local self-government and that of the general police power are constitutional grants of authority equivalent in dignity. A city may not regulate activities outside its borders, and the state may not restrict the exercise of the powers of self-government within a city." *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766.

{¶ 76} The Home Rule Amendment was added to the Ohio Constitution in 1912. It provides:

{¶ 77} "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 78} This provision has been interpreted as having exclusively delegated the "power of local self-government" to Ohio's municipalities. *Perrysburg v. Ridgway* (1923), 108 Ohio St. 245, 140 N.E. 595.

{¶ 79} In *Perrysburg v. Ridgway* (1923), 108 Ohio St. 245, 140 N.E. 595, the Ohio Supreme Court explained the legitimacy of such a delegation of power:

{¶ 80} " 'All political power is inherent in the people.'

{¶ 81} "This is the genesis of all American government. This identical language is in the Ohio Bill of Rights (Section 2, Article I), and in syllable or spirit it is found in all the state Constitutions. That 'political power' not only resides in the people, but remains with them until they have delegated it to some department of their state government, or some subdivision thereof.

{¶ 82} " * * *

{¶ 83} " 'They [the people] have, therefore, the most undoubted right to delegate just as much, or just as little, of this political power with which they are invested as they see proper, and to such agents or departments of government as they see fit to designate. To the Constitution we must look for the manner and extent of this delegation; and from that instrument alone must every department of the government derive its authority to exercise any portion of political power.'

{¶ 84} " * * *

{¶ 85} " 'That the powers of the subdivisions, as well as of the state herself, are derived from the Constitution, is undoubtedly true. But equally true is it that it was competent for the people to confer upon the one powers not conferred upon the other; and there is nothing in the least degree irrational in supposing a grant of power to a subdivision that is withheld from the state at large.' "

{¶ 86} The Ohio Supreme Court then described the historical situation that provided the motive for the Home Rule Amendment.

{¶ 87} "Prior to 1912 there was no express delegation of power to municipalities in the Ohio Constitution. Under the decisions of our courts, it had been held again and again, *Ravenna v. Pennsylvania Co.*, 45 Ohio St., 118, 12 N.E., 445, being especially in point, that municipal power was delegated only by virtue of a statute. Therefore municipalities of the state, especially the larger ones, were continually at the door of Ohio's General Assembly asking for additional political power for municipalities, or modifications in some form of previous delegations of such power. Such power, being legislative only, could be withdrawn from the municipalities, or amended, at any session of the Legislature.

{¶ 88} "Municipalities were, therefore, largely a political football for each succeeding Legislature, and there was neither stability of law, touching municipal power, nor sufficient elasticity of law to meet changed and changing municipal

conditions. To the sovereign people of Ohio the municipalities appealed in the constitutional convention of 1912, and the Eighteenth Amendment, then known as the 'Home Rule' Amendment, was for the first time adopted as a part of the Constitution of Ohio, wherein the sovereign people of the state expressly delegated to the sovereign people of the municipalities of the state full and complete political power in all matters of 'local self-government.' " Id.

{¶ 89} Finally, the Ohio Supreme Court described the political philosophy that provides the rationale for such a delegation of power to local government:

{¶ 90} "[The] doctrine of local sovereignty in local affairs was perhaps no better put than by Abraham Lincoln in 1859 in an address from the statehouse front at Columbus, Ohio. Discussing the Douglas doctrine of political sovereignty, Lincoln said:

{¶ 91} " 'I believe there is a genuine popular sovereignty. I think a definition of "genuine popular sovereignty," in the abstract, would be about this: That each man shall do precisely as he pleases with himself, and with all those things which exclusively concern him. Applied to government, this principle would be that a general government shall do all those things which pertain to it, and all the local governments shall do precisely as they please in respect to those matters which exclusively concern them.' " Id.

{¶ 92} In order to preserve such "genuine popular sovereignty" within municipalities, the Home Rule Amendment authorizes municipalities "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

3. **The Ohio Constitution establishes certain limits to the home rule powers that it grants. It also authorizes legislation in certain circumstances that would further limit those powers.**

{¶ 93} While the extent of home rule powers should not be underestimated, those powers are not without limits. The Constitution attempts to properly apportion power between state and municipal governments. In certain situations, the General Assembly is given limited power to enact certain types of legislation that would further limit the effective scope of constitutionally granted municipal powers. Since, as we will see, Chapter 4939 would limit the effective scope of constitutionally granted municipal powers, the primary issue in this case will be whether Chapter 4939 is the sort of legislation limiting municipal power that is authorized by the Ohio Constitution. We will focus on three ways in which the Ohio Constitution authorizes legislation that would limit the effective scope of constitutionally granted municipal powers.

{¶ 94} First, certain provisions of the Ohio Constitution other than the Home Rule Amendment explicitly give the General Assembly certain limited powers to limit municipal home rule powers. Section 13, Article XVIII, which allows the General Assembly to limit municipal taxation, is relevant to the current case.

{¶ 95} The second and third types of constitutionally authorized legislation limiting municipal power will be discussed in the next two sections of this decision.

a. *The "Statewide Concern Doctrine," which was designed to define the limits of the "powers of local self-government," provides a principle for distinguishing predominantly local subject matters from predominantly non-local subject matters. The General Assembly has the authority to enact legislation concerning predominantly non-local subject matters that would preclude conflicting municipal regulations enacted pursuant to the constitutionally granted "powers of local self-government" including the power to adopt and enforce local police, sanitary, and similar regulations.*

{¶ 96} The rationale for the Home Rule Amendment suggests a principled basis for determining what subject matters fall exclusively within the "power of local self-government" as opposed to those subject matters in which general laws enacted by the General Assembly would control. That basis has come to be known as the "Statewide-Concern Doctrine." As stated by the Ohio Supreme Court:

{¶ 97} "Once a matter has become of such general interest that it is necessary to make it subject to statewide control so as to require uniform statewide regulation, the municipality can no longer legislate in the field so as to conflict with the state." *Ohio Assn. of Private Detective Agencies v. N. Olmsted* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147.

{¶ 98} This raises the question as to how one can tell that the subject matter "has become of such general interest" so as to preclude municipal legislation that would conflict with the state's. The Ohio Supreme Court has provided three separate formulations for how such a determination is to be made. Two of those formulations are often stated by the court in succeeding paragraphs as in *Kettering v. State Emp. Relations Bd.* (1986), 26 Ohio St.3d 50, 26 OBR 42, 496 N.E.2d 983:

{¶ 99} "To determine whether legislation is such as falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. If the result affects only the municipality itself, with no extraterritorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality.

However, if the result is not so confined it becomes a matter for the General Assembly.

{¶ 100} "Thus, even if there is a matter of local concern involved, if the regulation of the subject matter affects the general public of the state as a whole more than it does the local inhabitants the matter passes from what was a matter for local government to a matter of general state interest." (Emphasis sic.) See, also, *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 44 O.O.2d 121, 239 N.E.2d 75.

{¶ 101} The third formulation is stated in *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766, and *Evans v. Moore* (1982), 69 Ohio St.2d 88, 23 O.O.3d 145, 431 N.E.2d 311, states:

{¶ 102} "Even if a matter is of local concern, the local regulation may have significant extraterritorial effects, in which case it properly becomes a matter of statewide concern for the General Assembly."

{¶ 103} The problem with these three formulations is that they can be separately interpreted to be inconsistent with each other so that they might then lead to inconsistent results. Review of the case law would suggest that has indeed happened.

{¶ 104} Nevertheless, it is clear that the Supreme Court intended for the three formulations to be interpreted in a manner that makes them equivalent. The court often states the first two formulations in succeeding paragraphs (as they are quoted above). When the court does so, the second paragraph begins with the word "thus," which indicates that the second formulation is meant to clarify the first. Hence, the Supreme Court intended that the first and second formulations be given equivalent interpretations with the second guiding the interpretation of the first.

{¶ 105} The third formulation originated in *Canton,* supra, wherein two cases were cited as the legal authority for the third formulation. Review of those two cases shows that the basis for the third formulation was the court's recitation of the first and second formulations in those cases. Thus, the Ohio Supreme Court intended that the three formulations be interpreted as being equivalent. The third formulation is merely meant to be a paraphrase of the first two.

{¶ 106} Since the second formulation was offered as a clarification of the first, and the third is only a paraphrase of the first two, it is the second formulation that should be regarded as controlling when interpreting the other two. Indeed, the Ohio Supreme Court has explicitly indicated that the "statewide concern doctrine" is "most cogently articulated" by the second formulation. *Evans,* supra. Furthermore, the Ohio Supreme Court indicated the importance of the

second formulation when the court chose to italicize the second formulation in *Kettering.*

{¶ 107} Beyond the fact that the Supreme Court appears to regard the second formulation as the most cogent, there is another good reason to focus upon the second formulation as providing the intended meaning of the other two. The interpretation given to any of the three formulations should not render the Home Rule Amendment incapable of serving its purposes. When the second formulation is not used to guide interpretation of the first and third formulations, they would tend to be interpreted in a manner that would not serve the purposes of the Home Rule Amendment.

{¶ 108} The first formulation could be read to require that *any* extraterritorial effect, regardless of how slight, places a subject matter within the exclusive jurisdiction of the General Assembly. Such a reading would eviscerate the Home Rule Amendment, since almost any legislation concerning local matters will have at least some minor and/or indirect extraterritorial effect. The purposes of the Home Rule Amendment would be defeated if the first formulation were given an interpretation that would render all subject matters to be non-local.

{¶ 109} Consequently, the first formulation should be regarded as intending something more like the third formulation wherein it is not merely the existence of *any* extraterritorial effect that is determinative. Under the third formulation, extraterritorial effects must be significant before a subject matter will be determined to be non-local. Hence, interpreting the first formulation in terms of the third formulation better serves the purposes of the Home Rule Amendment.

{¶ 110} Nevertheless, the third formulation is also infected with a vagueness that threatens to defeat the purposes of the Home Rule Amendment. "Significance" is not a discreet quality but rather a matter of degree. Furthermore, that which has an adequate degree of significance to count as "significant" in one context may not count as significant in another. In the absence of some principled basis for determining when extraterritorial effects have become sufficiently significant, the issue would be left for determination by the General Assembly. In the absence of a principled basis for making such a determination, the General Assembly would have unbridled discretionary control over the scope of municipal powers of local self-government. But that is the very situation that existed before the Home Rule Amendment was adopted. It was that situation, which the Ohio Supreme Court described in *Perrysburg,* that the Amendment was intended to overcome.

{¶ 111} "[M]unicipalities of the state, especially the larger ones, were continually at the door of Ohio's General Assembly asking for additional political power for municipalities, or modifications in some form of previous delegations of such

power. Such power, being legislative only, could be withdrawn from the municipalities, or amended, at any session of the Legislature.

{¶ 112} "Municipalities were, therefore, largely a political football for each succeeding Legislature, and there was neither stability of law, touching municipal power, nor sufficient elasticity of law to meet changed and changing municipal conditions."

{¶ 113} If the third formulation is interpreted in terms of the second, then such a return to the pre-amendment situation can be avoided. The second formulation provides a principled basis for determining whether extraterritorial effects are sufficiently significant. Extraterritorial effects are sufficiently significant to make state law controlling over conflicting local law if "regulation of the subject matter affects the general public as a whole more than it does the local inhabitants."

{¶ 114} In conclusion, whether one looks at what the Supreme Court intended by the three formulations, or at what best serves the purposes of the Home Rule Amendment, the second formulation should be regarded as providing the proper interpretation of the other two. Hence, in determining the scope of the powers of local self-government under the "statewide-concern doctrine," the essential inquiry is whether "regulation of the subject matter affects the general public as a whole more than it does the local inhabitants."[5]

---

5. {¶ a} The intent of the statewide-concern doctrine appears to be to maximize individual "autonomy," or in other words, to maximize each citizen's legal authority, as a voter, to utilize government to promote the realization of his/her conception of the good. As a starting point, a citizen has more control over his/her local government because the power of a citizen's vote is less diluted by the voting power of other citizens. Hence, as a general starting point, autonomy is maximized by making the regulations enacted by local governments supreme over state law. However, there are two situations in which autonomy is maximized by giving supremacy to state law over a particular subject matter. The first occurs when local regulation of a particular subject matter has effects upon citizens of other local jurisdictions which are so significant that allowing local control over the subject matter would bring about a reduction in the *average* autonomy of the citizens of Ohio. The second situation in which autonomy is maximized by making state law supreme with regard to a particular subject matter is where an objective which cannot be accomplished without statewide regulation is so strongly desired by a majority of citizens of the state that allowing state law supremacy over the subject matter would raise the *average* level of autonomy. The statewide-concern doctrine appears to be designed to recognize state law supremacy in each of these two situations while allowing local law to control in all other situations. Hence, the purpose of the statewide-concern doctrine appears to be to maximize the *average* autonomy of the citizens of Ohio.

{¶ b} Of course, the concern that arises with regard to any principle which aims at maximizing the average condition of citizens is that it might not ensure that minimum standards are met for all persons.

{¶ c} At the first level, that concern is met by the fact that most person's conceptions of the good include a concern for the general welfare of others so that average autonomy would not be raised, other things being equal, by measures that would be inconsistent with a concern for the general welfare of others. A court attempting to determine whether state or municipal

{¶ 115} There is a question that arises in cases like the current case when subject matters of varying degrees of generality overlap. Suppose that subject matter A includes subject matters B and C. Suppose regulation of subject matter B affects the general population of the state more than the local inhabitants, but regulation of C affects the local inhabitants more. If, cumulatively, regulation of A would affect the general population of the state more than the local inhabitants, does it follow that the dominance of state law would extend to the entire subject matter A, including subject matter C, even though the affects of regulation of C affect local inhabitants more than the general population of the state? This appears to be a question of first impression.

{¶ 116} A blanket determination that the affects of the broader subject matter should be determinative would appear to arbitrarily permit expansion of state power with the state benefiting less than the municipalities are harmed. Taken to an extreme, the Home Rule Amendment would be eviscerated if the broader subject matter were defined as "all legally controllable subject matters." While the general public might well be affected more by regulation of that broad subject matter, according state law dominance to such a broad subject matter would leave no subject matter wherein the local power of self-government would be dominant.

{¶ 117} A more measured resolution would be to ask whether, when considering the effects of extending state dominance beyond the narrower subject matter in which the appropriateness of state law dominance is unambiguous, the general public of the state is affected more by such an expansion than are the local residents. So, in our example, there might be a greater effect on the general

---

supremacy with regard to a particular subject matter would maximize average autonomy would do so with a view towards this and other generally shared features of the varying conceptions of the good held by Ohio's citizens. Of course, in determining such matters, courts will exercise strong presumptions in favor of the executive and legislative determinations of both state and municipal government, although that may become difficult where those authorities conflict.

{¶ d} At a second level, the concern that minimum standards should be satisfied for all persons is met by the fact that in a constitutional democracy, wherein the citizens are conclusively presumed to be dedicated to guaranteeing to all persons the minimum standards of autonomy established by their social contract, even against the evidence of legislative votes to the contrary, a court is effectively prevented from concluding that average autonomy is increased by reducing any person's degree of autonomy below that guaranteed to that person by the Constitution.

{¶ e} Of course, there is always a concern where a standard of review provides courts with broad powers of judgment. Nevertheless, it is hard to imagine how the Ohio Constitution could otherwise have provided for a division of power between the state and its municipalities that would be flexible enough to maximize autonomy, without depending heavily upon the judgment of courts to adjudicate disputes, when they arise, between state and municipal authorities asserting differing views as to the supremacy of their control over various subject matters.

public of the state than on the local inhabitants if it is difficult to effectively regulate subject matter B without regulating both subject matter B and subject matter C. That might be the case if subject matters B and C are difficult to distinguish. On the other hand, if regulation of subject matter B is not significantly affected by regulation of C, then extension of statewide dominance over subject matter C would probably affect local inhabitants more than the general public of the state. Hence, in that situation, municipal legislation concerning subject matter C enacted pursuant to municipal powers of local self-government other than the municipal police power would be dominant over state law.

{¶ 118} Such a resolution of the problem of inconsistent results when the statewide-concern doctrine's formula is applied to subject matters of varying generality best serves the apparent general aim of the statewide-concern doctrine by apportioning power between state and municipal governments to the government that can most productively use such power in the service of Ohio's citizens. Put in the terms of footnote 5 above, such a resolution maximizes the average level of autonomy for Ohio's citizens.

{¶ 119} Thus, generally, in applying the statewide-concern doctrine, one asks whether regulation of the subject matter affects the general public of the state more than the local inhabitants. But when application of the statewide-concern doctrine leads to inconsistent results with regard to a particular subject matter, because opposite results occur with regard to the subject matter itself and a broader subject matter within which it is included, then one should ask whether extension of state law dominance beyond the part of the broader subject matter in which state law dominance is unambiguously appropriate would affect the general public of the state as a whole more than the local inhabitants.

{¶ 120} If, upon application of these principles of the statewide-concern doctrine, it is found that, with regard to a particular subject matter, municipal regulation enacted pursuant to municipal powers of local self-government other than the municipal police power should be dominant over state law, then the General Assembly has no authority to limit municipal power to enact and enforce regulations covering that subject matter. However, if a subject matter is one in which state law should be dominant, then the General Assembly has authority to limit municipal regulation of that subject matter enacted pursuant to any municipal power of local self-government.

b. *The General Assembly has authority to limit municipal enactment of police, sanitary, and similar regulations by enacting "general laws" with which such municipal regulations may not conflict.*

{¶ 121} The Ohio Constitution grants to municipalities the power "to adopt and enforce within their limits such local police, sanitary and other

similar regulations, *as are not in conflict with general laws.*" (Emphasis added.) It is now well settled that the requirement that municipal regulations not conflict with the general laws is limited to local police, sanitary, and other similar regulations, and is not intended as a restriction on the powers of local self-government. *Ohio Assn. of Private Detective Agencies v. N. Olmsted* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147. Hence, the Ohio Constitution authorizes the General Assembly to effectively limit a municipality's constitutionally granted power to adopt and enforce local police, sanitary, and similar regulations by enacting "general laws" with which such municipal regulations cannot conflict. As will be discussed later in greater detail, the term "general law" is a technical term that does not refer to any and all laws passed by the General Assembly.

{¶ 122} Having reviewed the ways in which the General Assembly is authorized to limit municipal powers, and having seen that the "statewide-concern doctrine" is applicable to the "powers of local self-government," whereas the requirement that municipal regulations not conflict with the general law applies only to "local police, sanitary, and similar regulations," it now becomes necessary to ask whether the municipal power to regulate "public ways" falls under the "powers of local self-government," the power to adopt and enforce police, sanitary, and similar regulations, or both. For the reasons that follow, this court finds that the municipal regulation of the use of municipal "public ways" is authorized by the Ohio Constitution's grant of "all powers of local self-government" *and* by the grant of the power to adopt and enforce local police, sanitary, and similar regulations.

4. **The power to regulate the use of "public ways" is at least partly included in the constitutionally granted powers of local self-government other than the power to adopt police, sanitary, and similar regulations.**

{¶ 123} For the reasons which follow, this court holds that the power to regulate the use of municipal public ways by utility service providers and cable operators is included in the powers of local self-government other than the power to enact and enforce police, sanitary, and similar regulations granted to municipalities by the Home Rule Amendment to the Ohio Constitution.

{¶ 124} Courts have recognized that cities have a strong interest in maintaining control over the uses of their streets, roads, and similar public improvements. In *Perrysburg*, the Ohio Supreme Court stated:

{¶ 125} "It would be a bold assertion to say that 'all powers of local self-government,' as used in the Ohio Constitution of 1912, did not include the power of complete regulation and control of the streets. The streets and alleys of a municipality are what the arteries and veins are to a man. Control must be placed somewhere, and, if there is any virtue whatsoever in democracy, why

should not that control be placed in the community which opens the streets, pays for their establishment, their maintenance, and best understands their needs for durability and safety? ·

{¶ 126} " * * *

{¶ 127} "It has always been recognized, before 1912 as well as after, that matters relating to all local improvements, such as roads, streets, ditches, and the like, have been peculiarly matters of local concern and control."

{¶ 128} Hence, the *Perrysburg* syllabus states:

{¶ 129} "The power to establish, open, improve, maintain and repair public streets within the municipality, *and fully control the use of them,* is included within the term 'powers of local self-government.'" (Emphasis added.)

{¶ 130} In *Vernon v. Warner Amex Cable* (1986), 25 Ohio St.3d 117, 25 OBR 164, 495 N.E.2d 374, the Ohio Supreme Court cited that passage from the *Perrysburg* syllabus and then noted that "[t]he fee to streets within municipalities in Ohio rests in trust in the municipalities for street purposes" and concluded that "[t]he foregoing precedents leave no doubt that the regulation of the use of publicly owned or controlled property is an inherent exercise of a municipality's powers of local self-government, which necessarily include the municipality's police powers."

{¶ 131} Most recently, in *Linndale v. State* (1999), 85 Ohio St.3d 52, 706 N.E.2d 1227, the Ohio Supreme Court held that "a municipal corporation's authority to regulate traffic comes from the Ohio Constitution" and struck down a statute that attempted to limit the power of certain municipal corporations to regulate traffic.

{¶ 132} These precedents would appear to leave little doubt that a municipality's regulation of its own public ways falls within its power of local self-government.

{¶ 133} Indeed, plaintiffs cite the syllabus of *Perrysburg,* which has never been overruled, as conclusive proof that regulation of a municipality's public ways falls exclusively within "the powers of local self-government." Then, relying on case law that says that the General Assembly has no constitutional power to limit a municipality's exercise of the "powers of local self-government," plaintiffs argue that the General Assembly has no constitutional power to limit the power of Ohio municipalities to control their public ways. The argument is not persuasive.

{¶ 134} It is true that there are cases in which the Supreme Court sometimes appears to treat the "powers of local self-government" and "local police power" as mutually exclusive categories of local governmental power. For example, there appears to be such a distinction at work in *Ohio Assn. of Private Detective*

*Agencies, Inc. v. N. Olmsted* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147, wherein the Ohio Supreme Court described a three-step process for determining whether a municipal ordinance must yield to the provisions of a state statute. The first step treats the powers of local self-government and the local police power as mutually exclusive powers. The court said:

{¶ 135} "Initially, it must be ascertained whether the local ordinance seeks to exercise a power of local self-government or constitutes a police regulation." Id.

{¶ 136} While this test appears to assume that the "local police power" and the "powers of local self-government" are mutually exclusive categories of power, the Ohio Supreme Court has, at other times, indicated that the power to adopt local police, sanitary and similar regulations is included in the powers of local self-government:

{¶ 137} "As we view it, this constitutional provision [Section 3, Article XVIII] first gives municipalities 'authority to exercise all powers of local self-government,' *and then, with respect to some of those powers,* i.e., the power 'to adopt and enforce * * * local police, sanitary and other similar regulations,' it limits the powers to adopt such regulations to such 'as are not in conflict with general laws.' However, the limitation is only such a limited limitation." (Emphasis added.) Id. at 197, 5 O.O.2d at 485, 151 N.E.2d at 727. *Ohio Assn. of Pub. School Emp. v. Twinsburg* (1988), 36 Ohio St.3d 180, 522 N.E.2d 532, quoting *State ex rel. Canada v. Phillips* (1958), 168 Ohio St. 191, 5 O.O.2d 481, 151 N.E.2d 722. See also, *Vernon v. Warner Amex Cable* (1986), 25 Ohio St.3d 117, 25 OBR 164, 495 N.E.2d 374 (a municipality's powers of local self-government "necessarily include the municipality's police powers"); *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766 ("Municipalities may enact police and similar regulations under the powers of local self-government").

{¶ 138} There are two ways that this court could construe the apparent inconsistency in the Supreme Court's use of the phrase "powers of local self-government." One possibility would be to find that the later cases implicitly overrule the earlier cases. That would result in holding that the "powers of local self-government" do not include the power to enact "police, sanitary, and other similar regulations." The problem with such an interpretation is that it would foist upon the Ohio Constitution an interpretation that deviates from the ordinary meaning of the words "powers of local self-government" without any evidence that some such technical definition of that phrase existed at the time the Home Rule Amendment was adopted. Surely, in ordinary parlance, a municipality's power to enact police, sanitary, and other similar regulations is part and parcel of its power to govern itself.

{¶ 139} The other possibility is to interpret the words "powers of local self-government" as having two meanings: a broader meaning that would include *all* powers that a municipality typically exercises in governing itself, and a narrower meaning which would include all such powers except the power to enact police, sanitary, and other similar regulations. The narrow meaning would apply within the confines of the test, quoted above from *Ohio Assn. of Private Detective Agencies, Inc.* The contextual narrowing of the concept in that case was made clear by the requirement that one determine whether a regulation was enacted pursuant to the powers of local self-government "or" as a police, sanitary, or other similar regulation. By contrast, the broader definition of "powers of local self-government" clearly applies to the *Canada, School Employees, Vernon,* and *Canton* cases cited above, wherein the court explicitly stated that local police powers were included in the powers of local self-government.

{¶ 140} This second interpretation of the Supreme Court's use of the phrase "powers of local self-government" is preferable, since it does not do violence to the ordinary meaning of such words, and since it resolves an apparent inconsistency without assuming that the Ohio Supreme Court silently overruled its earlier cases. Hence, this court holds that the phrase "powers of local self-government" has two different meanings. Often, the scope of the phrase is broad enough to include the local power to enact police, sanitary, and similar regulations. However, the phrase has a narrower scope in contexts like the three-part test in *Ohio Assn. of Private Detective Agencies, Inc.,* in which the "powers of local self-government" is contrasted with the local power to enact police, sanitary, and other similar regulations. A determination as to which meaning is intended in a given context will involve review of that larger context to see which interpretation is most reasonable and most consistent with that context.

{¶ 141} Having found that the phrase "powers of local self-government" has two meanings, those two meanings will be differentiated throughout the remainder of this decision as follows: the "powers of local self-government" (narrowly construed) and the "powers of local self-government" (broadly construed).

{¶ 142} Since the phrase has two meanings, the issue arises as to what the Supreme Court meant in *Perrysburg* when it said:

{¶ 143} "The power to establish, open, improve, maintain and repair public streets within the municipality, and fully control the use of them, is included within the term 'powers of local self-government.' "

{¶ 144} In *Perrysburg,* the issue before the court was whether a municipal government had any power to enact an ordinance prohibiting a commercial bus line from establishing a bus stop on a city street. There was no allegation that the ordinance at issue conflicted with a state statute, and, hence, there was no need for the court even to consider whether the ordinance was enacted under the

power to enact police, sanitary, or similar regulations, or whether it was enacted pursuant to a "power of local self-government" (narrowly construed).

{¶ 145} In fact, it would be inappropriate to construe the court's holding as entailing that the "power to establish, open, improve, maintain and repair public streets within the municipality, and fully control the use of them" is not included in the power to enact police, sanitary, and similar regulations. Justice Day, one of the four Justices that made up the bare majority in the case, wrote a concurring opinion that explicitly reserved for future consideration the issue of whether the state might be able to assert some control over the public streets through the enactment of general law.

{¶ 146} Indeed, as will be discussed below, courts have since recognized at least one area (traffic speed regulation) in which municipal regulations of the streets is accomplished exclusively through local police regulations. The court found that the General Assembly could limit municipal control over an ordinary motorist's use of public streets through the enactment of general laws. In other cases that will be discussed below, courts have found that with regard to certain issues, municipal control over municipal streets falls under the powers of local self-government (narrowly construed) and is therefore not subject to limitation when a municipal ordinance conflicts with the "general law" of the state. These divergent cases raise the issue of how one identifies (1) the situations in which the municipal power of control over municipal streets can be derived only from the Ohio Constitution's grant of the "powers of local self-government" (narrowly construed), (2) the situations in which the municipal power of control over municipal streets can be derived only from the Ohio Constitution's grant of the power to enact or adopt police, sanitary, and similar regulations, and (3) situations in which the municipal power of control over municipal streets can be derived alternatively from *either* of the Ohio Constitution's grants of powers.

{¶ 147} Some courts have found that a municipality does have certain local powers of self-government (narrowly construed) regarding streets within the municipality, so that *regulations adopted pursuant to such powers are not subject to the requirement that they not conflict with the general law of the state.* In *Sparrow v. Columbus* (1974), 40 Ohio App.2d 453, 69 O.O.2d 405, 320 N.E.2d 297, the issue was whether county commissioners could vacate (permanently close) a municipally owned street located within the municipality in accordance with a state statute. The street had originally been established outside the municipality as a county road, but the municipality had expanded so that the street had come to be located within the municipality. The Franklin County Court of Appeals found that a municipality holds the fee (ownership) to streets within the municipality and that the power to decide whether to vacate such a street was a power of local self-government (narrowly construed). The court found that the county

commissioners' attempt to vacate a municipally owned street was an unconstitutional infringement upon the municipality's constitutionally granted powers of local self-government.

{¶ 148} *Sparrow* was followed by *Wallpe v. Cincinnati* (Mar. 27, 1996), Hamilton App. No. C–950490, 1996 WL 134548, and *Purtee v. Wayne Lakes* (Feb. 11, 1983), Darke App. No. 1075, 1983 WL 4810. In *Wallpe*, the court held that "as the municipal power to vacate streets is 'an exercise in local self-government,' the power to vacate is not subject to the general laws of the state." The court further explained that one "cannot invoke a general law of the state to vacate municipal streets when the city has exercised its right to local self-government by providing other means for vacating its streets."

{¶ 149} In *Sparrow* and *Wallpe*, the determination that the power to control vacation of the streets is an exercise of the powers of local self-government (narrowly construed) was based on the fact that the municipality owns the streets within the geographical limits of the municipality. In *Sparrow* and *Wallpe*, the courts cited *Babin v. Ashland* (1953), 160 Ohio St. 328, 52 O.O. 212, 116 N.E.2d 580, for the proposition that the power to convey municipal property is included in the "powers of local self-government" conferred by the Home Rule Amendment to the Ohio Constitution. In *Babin*, the Ohio Supreme Court explicitly stated that the Constitution does not give the General Assembly any authority to prevent or limit the municipal exercise of that power to convey municipal property. Hence, the Supreme Court meant that the power to convey municipal property is included in the "powers of local self-government" (narrowly construed).

{¶ 150} Since the municipal power to convey municipal property, and, specifically, municipally owned public ways, is included in the "powers of local self-government" (narrowly construed), so is the power to convey limited interests in that property. Consequently, unless the "statewide-concern doctrine" requires otherwise, the municipal powers of local self-government (narrowly construed) include the power to convey any right to occupy municipal public ways for purposes of installing, maintaining, and operating utility and cable equipment and facilities. The General Assembly, by enacting Chapter 4939, has attempted to transfer that right from the municipalities by declaring in Chapter 4939 that cable operators and utility service providers have such a right subject only to the requirements of the Ohio Revised Code. Since transfer of such a right falls within the scope of municipal "powers of local self-government" (narrowly construed), and since there is no constitutional provision specifically authorizing the General Assembly to limit the municipal power to decide whether to transfer such a property right, the only basis upon which the General Assembly's Act can be constitutionally valid is (pursuant to the "statewide-concern doctrine") if the

general public of the state is more affected by regulation of the transfer of such rights than the local inhabitants of Ohio's municipalities.

{¶ 151} First, it should be noted that the power to control one's conveyance of property provides a method of regulation that is different from police, sanitary, and other similar regulation. A property owner can regulate the use of his/her/its property by controlling what limited rights to use that property will be transferred to others. Such a power to regulate the conduct of others is different from the power to enact police, sanitary, and similar regulations because the power of control over one's own property is dependent upon having the status of being the property owner and does not include any right of control over the conduct of others when that conduct has nothing to do with the use or abuse of one's own property. By contrast, the power to enact police, sanitary, and similar regulations does not depend upon the status of property ownership and is not limited to control over other's use or abuse of one's own property.[6]

{¶ 152} In *Billings v. Cleveland Ry. Co.* (1915), 92 Ohio St. 478, 111 N.E. 155, the Ohio Supreme Court recognized that the power of a municipality, to transfer to a public utility the right to occupy a municipal street with its equipment and

---

6. {¶ a} The state, citing *Auxter v. Toledo* (1962), 173 Ohio St. 444, 20 O.O.2d 71, 183 N.E.2d 920, and *Ohio Assn. of Private Detective Agencies, Inc.*, argues that any municipal regulation that requires a permit or license prior to engaging in an activity is a police regulation. The argument is unpersuasive. While both cases have language suggesting that any such regulation is a police regulation, neither case involved a municipality regulating the use of its own property and hence both of those cases are factually distinguishable. This court finds that the cited passages are mere dicta insofar as they might be read broadly to apply to facts not at issue in those cases. It is worthy of note that the Supreme Court chose not to incorporate those passages into its syllabi (which are the portions of a Supreme Court opinion that is binding upon lower courts. See former Supreme Court Rules for the Reporting of Opinions, Rule 1.). By way of contrast, this court is bound by the reported decisional law of the Franklin County Court of Appeals, including the *Sparrow* case, in which a municipality's control of its own property was held to be a matter of local self-government (narrowly construed).

{¶ b} The state cites *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278, as another example of a case where licensing was found to be a matter of statewide concern. However, that case is also distinguishable as a case not involving a municipality's control of its own property.

{¶ c} Finally, the state cites *State ex rel. McElroy v. Akron* (1962) 173 Ohio St. 189, 19 O.O.2d 3, 181 N.E.2d 26, in which the issue was whether state-law licensing requirements for watercraft occupied the field so that a municipality could not require that watercraft satisfy separate municipal licensing requirements prior to use on municipally owned waters. It is instructive that the court did not merely announce that all licensing requirements are police regulations and that therefore the municipal regulations were preempted because they conflicted with the general law of the state. Instead, the court focused upon the question of whether statewide concerns for statewide uniformity in watercraft safety regulations at a time when the recreational use of watercraft had increased significantly was a matter in which statewide concerns had become predominant. That is precisely the sort of inquiry that this court is proposing in the current case. It is the sort of inquiry that is appropriate where a municipality's powers of local self-government are at issue.

facilities, was a power of local self-government (narrowly construed). When neighboring property owners challenged the municipality's power to transfer such a right without obtaining its consent as required by a state statute, the court said that the subject matter of the statute (the transfer of rights to use the street) was a matter of local concern and that, consequently, the state statute "would fall simply because it is inconsistent." Since the court found the municipal ordinance granting the right to the utility to be superior to the state's general law, the court had determined that power to transfer to a utility a right to use the street was a power of local self-government (narrowly construed).

{¶ 153} In three cases, *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 167 N.E. 158, *Lorain Street Rd. Co. v. Pub. Util. Comm.* (1925), 113 Ohio St. 68, 148 N.E. 577, and *State ex rel. Klapp v. Dayton Power & Light Co.* (1967), 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230, the court found that certain municipal attempts to control the use of municipal streets do involve an exercise of the municipal power to enact police, sanitary, and similar regulations rather than an exercise of a "power of local self-government" (narrowly construed). What is noteworthy about these cases is not that they found that municipal regulations governing use of streets might be enacted pursuant to the municipal police power, but that these cases assumed, or concluded without explanation, that the municipal police power was the only basis of the municipal regulations at issue.

{¶ 154} In *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 167 N.E. 158, the Ohio Supreme Court held that a municipal speed-limit ordinance was a police regulation and was invalid because it conflicted with the general law of the state. Unfortunately, for our purposes of trying to glean the principles for determining when, if ever, regulation of the use of public ways is an exercise of the powers of local self-government, the court simply assumed without explanation that local traffic regulation was a form of local police regulation rather than an exercise of a municipality's power of local self-government (narrowly construed).

{¶ 155} There is a reasonable basis for concluding that municipal regulation of ordinary vehicular traffic on municipal ways can be accomplished only by local police regulation. The fee to streets within municipalities in Ohio rests in *trust* in the municipality for street purposes. *Vernon v. Warner Amex Cable Communications, Inc.* (1986), 25 Ohio St.3d 117, 25 OBR 164, 495 N.E.2d 374. Since the public is the beneficiary of the trust, the municipality, as legal owner of the trust property, must allow the public to use its streets for ordinary transportation purposes. *State ex rel. Crabbe v. Sandusky, Mansfield & Newark Rd. Co.* (1924), 111 Ohio St. 512, 146 N.E. 58. Consequently, a municipality has no power deriving solely from its legal ownership of streets to set conditions for the

transfer of the right to use the streets for ordinary transportation purposes.[7] Members of the public already possess that right merely by virtue of being beneficiaries of the trust. Thus, the only way a municipality can regulate the public's use of its streets for ordinary transportation purposes is through exercising its municipal police power. Hence, the *Schneiderman* court had a reasonable basis for its assumption that the traffic ordinance it was considering was necessarily a police regulation.

{¶ 156} The nature of the trust does permit, but does not require, that the municipality allow municipal streets to be used in manners consistent with the public's use of the streets for ordinary transportation. Id. The use of municipal streets by utility companies for purposes of installing their equipment and supplies falls within this second category of uses (unless their use becomes inconsistent with the public's ordinary transportation use). Id. Thus, municipalities are generally able to exercise their power of local self-government (narrowly construed) as the owner of municipal public ways to reasonably regulate the use of its public ways by utility service providers and cable operators (except, in matters of statewide concern, any municipal regulation must be consistent with state law). *Billings,* supra.

{¶ 157} In conclusion, a municipality can rely upon its police power only when regulating the public's ordinary transportation uses of municipal public ways. However, a municipality can rely upon its powers of local self-government (narrowly construed) when it is regulating other uses of municipal public ways such as, per *Billings,* the use of public ways by utility companies who would install and operate their equipment and facilities in and along the public ways.

{¶ 158} Given this distinction, *Billings* and *Schneiderman* are appropriately distinguishable and consistent with each other.

{¶ 159} The distinction also explains why, in *Lorain Street Rd. Co. v. Pub. Util. Comm.* (1925), 113 Ohio St. 68, 148 N.E. 577, the four-Justice majority did not agree with the two concurring justices who said the majority's per curiam opinion overruled *Billings* because it treated a municipal attempt to regulate traffic as an exercise of the municipal police power rather than an exercise of the powers of local self-government (narrowly construed). The majority correctly realized that while regulation of ordinary traffic was necessarily an exercise of the local police power, the same was not true of the regulation of a utility company's installation of equipment and facilities in and along a public way.

---

7. Ordinary transportation purposes may not include operation of a bus line, a street railway, or heavy trucks. *Murphy v. Toledo* (1923), 108 Ohio St. 342, 140 N.E. 626; *Niles v. Dean* (1971), 25 Ohio St.2d 284, 54 O.O.2d 392, 268 N.E.2d 275; *Union Sand & Supply Corp. v. Fairport* (1961), 172 Ohio St. 387, 16 O.O.2d 244, 176 N.E.2d 224; *Crabbe,* supra.

{¶ 160} We turn now to a case where a utility company's use of a municipal public way was at issue. In *State ex rel. Klapp v. Dayton Power & Light Co.* (1967), 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230, a municipality sought, by way of a quo warranto action, a declaration that a privately owned public utility company did not have a valid franchise for use of the municipality's streets, and for an order that would require the company to remove its poles, wires, and equipment from the municipality's public ways, and abandon local service. It sought that order without first satisfying a state-law requirement, under the Miller Act, that the dispute be heard by the Public Utilities Commission. The court determined, without explanation, that the municipality was attempting to exercise police power.

{¶ 161} *Klapp* is a particularly enigmatic case. In spite of prior Supreme Court precedents indicating that municipal power to control the use of public streets was an exercise of the "power of local self-government" (narrowly construed), the court assumed, without explanation, and without indicating that those prior precedents were being overruled, that the municipality's actions were based solely upon the police power. Perhaps as a means of explaining its cryptic determination, the court indicated that it would not review the extensive issues already discussed in the earlier decisions issued during the extensive appellate history of the case, but that it agreed with the conclusions of the earlier decisions. The court further stated, "We agree with the several holdings of the court of appeals, and its last judgment rendered herein, from which this appeal is taken, is affirmed." Hence it would appear appropriate to review the court of appeals' decision to find a basis for the Supreme Court's unexplained determination. The problem is that the court of appeals' several holdings have the appearance of contradicting themselves on the issue of whether municipal control over the use of municipal streets by utility companies is an exercise of the police power or a power of local-self government (narrowly construed).

{¶ 162} After noting that the power to fully control the use of the streets (including, per *Billings,* control over the installation of utility equipment in and on those streets) is a power of local self-government, the court said, "These municipal powers of local self-government cannot be limited by general laws passed by the Legislature, as local police, sanitary and similar regulations can be limited if they conflict with general laws." *State ex rel. Klapp v. Dayton Power & Light Co.* (1962), 11 Ohio App.2d 64, 40 O.O.2d 230, 228 N.E.2d 673. Clearly, the court had determined that control over the use of municipal streets by utility companies is included in the powers of local self-government (narrowly construed). Nevertheless, at the end of the decision, the court said, "We hold that Piqua, in filing this action seeking to oust the Power Company, is exercising a

police power in a manner that conflicts with general laws of the state applicable to the subject matter, to wit, the 'Miller Act.'"

{¶ 163} The court did cite *Cleveland Tel. Co. v. Cleveland* (1918), 98 Ohio St. 358, 121 N.E. 701, for the proposition that an ordinance fixing the rate that can be charged for utility services is a police regulation. However, why is *Cleveland Telephone* relevant? *Billings* would appear to be the more directly applicable case, since it involved municipal regulation of the use of municipal streets by a public utility. The *Cleveland Telephone* case explicitly distinguished itself from *Billings* on that basis. Hence, we are left with the puzzle of why the *Klapp* court of appeals, whose determination was later adopted without explanation by the Supreme Court, thought that ousting a utility from its streets was more analogous to rate fixing than it was to originally granting permission to install utility equipment in municipal streets.

{¶ 164} The court cites *Commrs. of Franklin Cty. v. Pub. Util. Comm.* (1923), 107 Ohio St. 442, 140 N.E. 87, which said:

{¶ 165} "The authority for this legislation [the Miller Act] rests upon the police power of the state. The police power is inherent in sovereignty. It is not brought into existence by the Legislature. All legislative action upon subjects where the police power is involved is merely a recognition of a power already existing. Legislation in furtherance of the police power is only limited by the public welfare and the inhibition of the people's Constitution. The Miller Act did not create the right of the sovereign state to stand guard over the abandonment or withdrawal of utility service. It merely regulated the mode of its exercise."

{¶ 166} *Commissioners* recognizes that the state's police power is limited by "the inhibition of the people's Constitution." The Ohio Constitution's grant of all powers of local self-government to municipalities is such an inhibition. Nevertheless, *Commissioners* declares that the state has a right that predates the Miller Act "to stand guard over the abandonment or withdrawal of utility service." Given that Ohio municipalities otherwise possess a power of local self-government giving them control over the use of their streets by public utilities, *Commissioners* can be correct about the extent of the state's police power in this regard only if the abandonment or withdrawal of utility service is a matter of statewide concern. Hence, the unspoken implication of *Commissioners* is that the termination of utility service is a matter of statewide concern even when such termination is brought about by a municipal requirement that the utility company remove its lines and facilities from municipal public ways.

{¶ 167} The ideas that would have controlled judgments as to statewide concerns when the Ohio General Assembly and Ohio courts evaluated the constitutionality of the Miller Act may not now, in this age of utility deregulation, be as much in vogue as they once were. But those ideas must be recognized if

we are to fully understand prior court precedents. Those ideas were described by *Cleveland v. E. Ohio Gas Co.* (1929), 34 Ohio App. 97, 170 N.E. 586:

{¶ 168} "There are certain products furnished the public, which, in their very nature, are not competitive. A monopoly is the best thing for the public, and it is upon that theory that the two gas companies existing in Cleveland when the East Ohio Gas Company got its franchise were merged into the East Ohio Gas Company. The public is best served by a public utility having the field solely to itself, and not by competition. Now, of course, with this trend of thought on public service, the public must not be left to the rapacity of utilities corporations, so that they may demand any price and get it, because then the people would be at their mercy, and consequently rate-fixing commissions, utilities commissions, that supervise, regulate and curb the rapacity of a utility that otherwise might squeeze the very lifeblood out of the people, have come into existence.

{¶ 169} "The Miller Act was in keeping with the general trend of public thought upon this question. If you recognize the monopoly, and the crowding out of all competitors, there must be some way in which the public may be protected, otherwise the people will be subject to what Justice Stone of the United States Supreme Court said, that is, they will be compelled to yield to an unconscionable contract because of their utter inability to cope with the utility which has the very necessities of life in its control and refuses to contract with the public, no matter how urgent the need, unless it can have its own price; and the utility could make that price so high that it would be inimical to the interest of the people who were compelled to yield to its exactions.

{¶ 170} "The latest pronouncement upon this subject is found in the case of *United Fuel Gas Co. v. Railroad Commission of Kentucky* (1929), 278 U.S., 300, 309, 49 S.Ct., 150, 152, 73 L.Ed., 390, from which we quote as follows:

{¶ 171} " 'The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit *it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give.* An important purpose of state supervision is to prevent such discriminations, see *New York & Queens Gas Co. v. McCall* [(1917)], *supra*, at page 351 [of 245 U.S. 345, 38 S.Ct., 122, 62 L.Ed., 337], and, if a public service company may not refuse to serve a territory where the return is reasonable, or even in some circumstances where the return is inadequate but that on its total related business is sufficient, *Atlantic Coast Line v. N. Car. Corp. Comm.* [(1907)], *supra*, at page 25 [of 206 U.S. 1, 27 S.Ct., 585, 51 L.Ed., 933, 11 Ann. Cas., 398]; *Missouri Pac. Ry. Co. v. Kansas* [(1910)], *supra*, at page 277 [of 216 U.S. 262, 30 S.Ct., 330, 54 L.Ed., 472], *it goes without saying that it may not use its privileged position, in conjunction with the demand which it has created, as a*

*weapon to control rates by threatening to discontinue that part of its service if it does not receive the rate demanded.'"*

{¶ 172} Recently, the Ohio Supreme Court reiterated, "The Miller Act was enacted to protect consumers from having their service terminated because of the whims of a public utility or rogue municipality." *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 671 N.E.2d 241. Hence, the Miller Act needed to respond to both threats posed by allowing utility services to be delivered by franchised monopolies: rate gouging and unnecessary termination of service.

{¶ 173} The consuming public needed protection from termination of utility service by a utility monopoly because access to services from another provider is not available when the market is controlled by a monopoly. Once again this was a common need affecting the general public of the state as a whole. Providing for statewide regulation of termination of service would be much more effective than allowing local authorities the power to regulate the conditions for termination of utility service. If left to the local authorities, conditions for termination of service would be a matter of negotiation at the time the powerful utility monopoly negotiates its franchise contract. Given the especially strong negotiating position of a monopoly, leaving the issue in the hands of municipal negotiators does not adequately protect consumers from unnecessary termination of service. The use of a nonpolitical, professional, statewide agency with expertise in utility regulation to determine the conditions under which termination of service was appropriate and when it would unnecessarily harm utility consumers, was thought to provide the best means for protecting the public while being fair to the utility companies.

{¶ 174} Although the Supreme Court has never said it explicitly, the implication of *Commissioners* is that, when utility markets are controlled by monopolies, protecting consumers from rate gouging and unnecessary termination of utility service is a matter of statewide concern. The existence of such statewide concerns affect the scope of a municipality's local self-government power with regard to control over the use of its streets. As stated by the Ohio Supreme Court in *Cleveland v. Shaker Hts.* (1987), 30 Ohio St.3d 49, 30 OBR 156, 507 N.E.2d 323:

{¶ 175} "This court has consistently held that the aforementioned provision—commonly referred to as the Home Rule Amendment—confers a high measure of sovereignty upon municipalities and we have recognized that municipalities have broad powers and duties with respect to streets and highways within their limits. *Cincinnati Motor Transp. Assn. v. Lincoln Hts.* (1971), 25 Ohio St.2d 203, 54 O.O.2d 317, 267 N.E.2d 797. However, absolute power with respect to this phase of self-government must be tempered by legislation enacted by the General

Assembly pursuant to the state's police powers *affecting matters of statewide concern."* (Emphasis added.)

{¶ 176} From this it follows that, since regulation of the termination of utility service, when the utility market is controlled by a monopoly, is a matter of statewide concern, a municipality does not have the power, so long as utility markets are controlled by monopolies, to exercise the control of its municipal property in such a way as to effect a termination of utility service in a manner that would be inconsistent with the state's police regulations.

{¶ 177} Returning to the question of why the *Klapp* courts decided to treat the attempt to oust a utility from its streets as an exercise of the police power, it would now appear that the point of the argument was that the municipality could not have been exercising any power of local self-government to terminate utility service by requiring the removal of equipment and facilities from public ways, because, pursuant to the statewide-concern doctrine, the municipality's local self-government power did not include the power to engage in such conduct. By process of elimination, the municipality must have been exercising a police power. But note, the municipality could not have been exercising a local police power, since the local police power, which is included in the powers of local self-government (broadly construed) is also limited by the statewide-concern doctrine. *Weir v. Rimmelin* (1984), 15 Ohio St.3d 55, 15 OBR 151, 472 N.E.2d 341. What other police power could the municipality have been exercising? The answer to this puzzle lies in a close reading of the *Klapp* court of appeals holding, which was adopted by the Supreme Court:

{¶ 178} "We hold that Piqua, *in filing this action* seeking to oust the Power Company, is exercising *a* police power." (Emphasis added.)

{¶ 179} Note that the court did not say that Piqua was exercising its local police power but only that it was exercising a police power. Piqua was, in fact, exercising the state's police power. The action was a quo warranto action that, except in the instance of a private citizen claiming title to a public office, can be brought only by the Attorney General or a prosecuting attorney on behalf of the state.[8] *Coyne v. Todia* (1989), 45 Ohio St.3d 232, 543 N.E.2d 1271. *Ohio Hosp. Assn. v. Community Mut. Ins. Co.* (1987), 31 Ohio St.3d 215, 31 OBR 411, 509 N.E.2d 1263. Hence, the action was being prosecuted by the state on behalf of the state because of the state's interest in its municipality. But, of course, the state's own police power cannot be used in a manner that is inconsistent with its

---

8. It is arguable that, in light of the Home Rule Amendment, a municipality could disregard the statutory procedure and directly institute its own quo warranto action on its own behalf. However, that is not what Piqua did in *Klapp*.

own police regulations. Hence, the Supreme Court later explained the holding in *Klapp*, without *any* reference to local police powers:

{¶ 180} An action in quo warranto was "not maintainable" where it would have the effect of bypassing a statutory scheme of regulation enacted by the General Assembly to govern public utilities. *State ex rel. Klapp v. Dayton Power & Light Co.* (1967), 10 Ohio St.2d 14, 30 O.O.2d 9, 225 N.E.2d 230.

{¶ 181} In conclusion, *Klapp* should not be interpreted as being inconsistent with *Billings*. It does not stand for the proposition that a municipality necessarily exercises its police power rather than its powers of local self-government (narrowly construed) when it regulates the use of its public ways by utilities. Rather, *Klapp* stands for the proposition that, in the context of utility markets controlled by monopolies, a municipality's self-government power with regard to control of its public ways does not include the power to regulate utility rates or the termination of utility services in a manner that would be inconsistent with the state's police regulations.

{¶ 182} Defendant has one more argument that the municipal power of control over "public ways" is not included in "the powers of local self-government" (narrowly construed). In *Garcia v. Siffrin Residential Assn.* (1980), 63 Ohio St.2d 259, 17 O.O.3d 167, 407 N.E.2d 1369, the Ohio Supreme Court indicated that "the powers of self government" (narrowly construed) are "governmental" and "administrative" in nature, and relate to "internal municipal organization." The court did not define what it meant by "governmental" or "administrative" but did indicate that an example would be the power to enact ordinances that set forth the form, structure, and operation of municipal government. Id. Defendant appears to assume that the court was defining "governmental" and "administrative" rather than offering an example.

{¶ 183} The language used by the court did not indicate that the example was meant to be an exhaustive list of "governmental" and "administrative" matters. The term "governmental" is a term of art in Ohio law. "Governmental" functions are distinguished from "proprietary" functions. In *Wooster v. Arbenz* (1927), 116 Ohio St. 281, 156 N.E. 210, the court held in paragraph one of the syllabus:

{¶ 184} "Streets and highways are public and governmental institutions, maintained for the free use of all citizens of the state, and municipalities while engaged in the improvement of streets are engaged in the performance of a governmental function."

{¶ 185} In support of the conclusion that improvement of the streets is a governmental function, the court said:

{¶ 186} "Inasmuch as the controversy must turn in its last analysis upon the character of a street and the governmental obligation to maintain it, it becomes

necessary to resort to a discussion of the fundamentals and an inquiry into the origin and nature of public ways. A highway is not necessarily and always a street, but a street is necessarily and always a highway. Highways are necessary adjuncts of society and date back to ancient periods. In English common law they were called the King's highways, leading to all parts of the realm. By both the common law and the civil law, all classes of men of whatever rank or dignity were required as a part of the duty owing to the sovereign to aid in the repair and improvement of roads. The care of the roads was imposed upon the parishes by a statute of 22 Henry VIII (1 Eng. Stats., Revised Ed., 387, 391), and by another statute a parish might be indicted for neglect of this duty. From the earliest times surveyors of highways have been chosen as public officials to discharge the duty of maintaining and repairing roads. The reasons which caused highways to have a public character and to become the subject-matter of governmental care in ancient times have even greater force in modern times because of the enormous increase of travel and therefore the need of improved facilities for travel. Property has but little value unless it is accessible to a street or highway. It is one of the essential characteristics of a highway that it is for the free use of every member of the commonwealth, and all persons, including abutting owners, are forbidden to limit or restrict its use for purposes of travel, except that its use for public utility may be regulated.

{¶ 187} "The state of Ohio has always recognized its obligation to keep the public ways open, and has delegated that duty to municipalities so far as streets and alleys within municipalities are concerned.

{¶ 188} " * * *

{¶ 189} "[I]t has become firmly established that the maintenance of streets, alleys, and other highways is the performance of a governmental function."

{¶ 190} A municipality cannot reasonably ban the use of its street by all utility service providers and cable operators. Hence, the municipal obligation to keep the streets open includes the obligation to administer the use of its streets by such companies. Thus, a municipality is engaging in a governmental function when it administers the use of its streets by utility service providers and cable operators. Consequently, the power of local self-government (narrowly construed) by which municipalities control the use of municipal streets by such businesses is a "purely governmental" power.

{¶ 191} *Garcia* also describes "powers of local self-government" (narrowly construed) as being concerned only with "internal municipal organization." Note that the court did not say "internal organization of municipal government." The use of the phrase "internal municipal organization" was used in *Garcia* to describe the subject matter of powers of local self-government (narrowly con-

strued) was based upon *State ex rel. Toledo v. Cooper* (1917), 97 Ohio St. 86, 119 N.E. 253, which said that the powers of local self-government (narrowly construed) are "purely governmental." Hence, powers having to do with "internal municipal organization" were not intended by *Garcia* to narrow the "purely governmental" powers referred to by *Cooper*. The latter case characterized a "purely governmental" power as "a power of sovereignty." A necessary connection with sovereignty is what distinguishes "governmental" functions from "proprietary" functions. *Wooster*, supra. *Greene Cty. Agricultural Soc. v. Liming* (2000), 89 Ohio St.3d 551, 733 N.E.2d 1141. Hence, the phrase "internal municipal organization" should, if possible, not be given an interpretation that would imply a narrower scope for powers of local self-government (narrowly construed) than is entailed by their being "purely governmental" powers. Rather than give these terms an interpretation that would make *Garcia* inconsistent with *Cooper, Billings*, and *Babin*, this court construed "internal municipal organization" as not only referring to the organization of municipal agencies and offices but also to the organization of municipal governmental assets located within the municipality.[9]

{¶ 192} In summary, generally, a municipality's power of self-government (narrowly construed) includes the power to control the use of its municipally owned public ways by utility service providers and cable operators when their use involves installing and operating their equipment and facilities. So long as the statewide-concern doctrine does not require otherwise, municipal regulation of such uses of the public ways prevails over state law. However, when regulation of a subject matter affects the general public of the state more than the local inhabitants, then municipal regulation, whether pursuant to the powers of local self-government (narrowly construed) or pursuant to the power to enact local police, sanitary, and similar regulations, must not be inconsistent with the state's police regulations.

{¶ 193} This court has been able to identify two kinds of subject matters with regard to which prior case law has recognized statewide concerns that would limit the municipal power of local self-government (narrowly construed) allowing municipal control of the use of municipal public ways by utility and cable companies. As discussed above, one such kind of subject matter is, in the context of utility markets controlled by monopolies, termination of utility service and rate regulation.

{¶ 194} The second kind of relevant subject matters of statewide concern have been some issues relating to intercity and interstate utility service. Al-

---

9. Since *Wooster* characterized municipal streets as "governmental institutions," organization of municipal streets could be characterized as being part of organizing the governmental institutions of a municipality.

though the case did not involve municipal control of public ways, the Supreme Court found that regulation of high voltage lines carrying power between municipalities, as opposed to distributing power within a single municipality, was a matter of statewide concern. *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 44 O.O.2d 121, 239 N.E.2d 75. The court noted that the statute being contested in that case left matters of local concern in the hands of the municipality. The municipality was left with the ability to regulate the installation of all local and lower voltage lines. Furthermore, even in the case of the high voltage lines, the General Assembly left intact the municipality's power to impose reasonable conditions prior to giving its consent to the installation of such lines. The court indicated that the municipality could refuse to grant a permit if the construction would so interfere with city planning as to affect the general welfare.

{¶ 195} These situations wherein statewide concerns were found to predominate can be contrasted with the current situation surrounding the enactment of Chapter 4939. First, given the federal law prohibiting the government discrimination between telecommunication service providers, which is already binding upon Ohio's municipalities because of the supremacy of federal law, the statewide concerns regarding regulation of telecommunications monopolies that were operative in upholding the Miller Act have diminished. The same is true with regard to other utility service providers and cable operators, since this court shall determine below that the prohibition of such discrimination in R.C. 4939.02(B) does not violate the Home Rule provisions of the Ohio Constitution, since discrimination among such businesses is a matter of statewide concern. As the utility market becomes one characterized by competition rather than monopolies, statewide concerns predicated upon the dangers of overreaching public utility monopolies recede.

{¶ 196} Second, unlike the statute in *Painesville*, Chapter 4939 is not limited to intercity lines, much less high voltage lines, nor, as discussed below, does Chapter 4939 unambiguously leave intact a municipality's power to set reasonable conditions prior to granting a permit.

{¶ 197} Hence, Chapter 4939 goes well beyond what was authorized by earlier cases.[10] The question for this court will be whether the "statewide-concern doctrine" justifies such an extension of the General Assembly's encroachment into municipal powers of local self-government.

---

10. {¶ a} *The Payphone Assn. of Ohio v. Cleveland* (2001), 146 Ohio App.3d 319, 766 N.E.2d 167, *could* be read as being inconsistent with this court's reasoning. The Payphone Association of Ohio claimed that Cleveland had discriminated against its members in violation of R.C. 4939.02(B). Cleveland responded by arguing that Chapter 4939 unconstitutionally infringed upon its home rule powers. Stating that "[s]tate control over utilities has been the norm in

## 5. The constitutionally granted local police power is an alternative basis for municipal control over "public ways."

 {¶ 198} "An exercise of the police power * * * is valid if it bears a real and substantial relationship to the public health, safety, morals or general welfare, and if it is not unreasonable or arbitrary." *Ottawa Cty. Bd. of Commrs. v. Marblehead* (1999), 86 Ohio.St.3d 43, 711 N.E.2d 663. This principle establishes what sorts of regulations can be enacted pursuant to the police power. Hence, the Home Rule Amendment, which says that "Municipalities shall have the authority * * * to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws" provides municipalities with the power to adopt regulations that have a real and substantial relationship to the *local* "public health, safety, morals or general welfare," and to enforce such regulations *within their municipal borders*, provided such regulations do not conflict with the general laws of the state.[11]

 {¶ 199} It was previously noted that a municipality can, in certain circumstances, rely upon the Ohio Constitution's grant of "all powers of local self-government" as authorizing its regulation of the use of its public ways. There is no reason why a municipality cannot also, or alternatively, rely upon the grant of the local police power as a constitutional basis for its regulation of the use of its

---

Ohio," the court found that Chapter 4939 spoke to a statewide concern and, hence, did not impinge upon Cleveland's constitutionally granted home rule powers.

{¶ b} *Payphone Assn.* is not controlling authority, since it was only the constitutionality of R.C. 4939.02(B) that was truly at issue in that case rather than the constitutionality of the entire Chapter 4939. On that narrower issue, this court agrees that R.C. 4939.02(B) does not unconstitutionally infringe upon a municipality's home rule powers. Because of the narrow focus of that case, the court would not have fully considered, or have been presented with all of the arguments, concerning the constitutionality of the other provisions of Chapter 4939. Hence, caution should be exercised before reading *Payphone Assn.* as determinative of the broader issue of whether the whole of Chapter 4939 is constitutional.

{¶ c} This court does not agree with the broad statement that "[s]tate control of utilities has been the norm in Ohio." That statement fails to recognize *Billings*, in which municipal regulation of the use of municipal public ways by a utility was found to be supreme over state regulation because it was an exercise of a power of local self-government (narrowly construed). It also fails to note that when state law was found supreme, it was only where intercity or interstate lines and facilities were involved, or where there was a statewide need to protect consumers from overreaching utility monopolies. Furthermore, the statutes that were previously upheld were careful to leave much of the constitutionally granted municipal powers of control over public ways intact.

11. The Constitution grants to municipalities only the power to enforce their local police regulations *within their own borders*. Hence, a municipality cannot rely upon its constitutionally granted police power to control the use of any municipally owned public way located outside the municipality. Regulation of extraterritorial municipal public ways must be based upon a different power of local self-government. However, even the exercise of the municipal property power may be more limited in scope when applied to any extraterritorial, municipally owned public way.

public ways. Since a court must assume that a municipality intends its ordinances to be valid and effective, if an ordinance can be construed as being based upon either its powers of local self-government (narrowly construed) or its local police power, then a court must construe the ordinance as being based upon the grant of power under which the ordinance would be valid and effective.

{¶ 200} Consequently, when determining whether Chapter 4939 is unconstitutional, it is necessary to determine whether that chapter would interfere with the exercise of either of the two kinds of municipal power granted by the Home Rule Amendment. This court now turns to the question of whether Chapter 4939 unconstitutionally interferes with the municipal exercise of either sort of constitutionally granted municipal power.

6. **R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) would restrict the constitutionally granted municipal powers of local self-government (narrowly construed), and the *constitutionally granted* municipal local police powers, so that such powers would no longer include (1) any *constitutionally granted* municipal power of control over the use of municipal public ways by utility service providers and cable operators for purposes of installing their equipment and facilities, or (2) any power to require that the municipality be fully compensated for use of its municipal public ways by utility service providers and cable operators.**

{¶ 201} This part of this decision is concerned only with the extent to which certain sections of Chapter 4939 would limit the home rule powers granted to municipalities by the Ohio Constitution. This part of the decision does not yet attempt to answer the question of whether any such attempts to statutorily limit municipal home rule powers are constitutional. The General Assembly has been authorized by the Ohio Constitution to limit municipal home rule powers in certain situations. After this court has considered the extent to which Chapter 4939 would limit constitutionally granted municipal home rule powers, this court will, in a later part of this decision, turn to the issue of whether various attempts in Chapter 4939 to limit municipal home rule powers are authorized by the Ohio Constitution.

a. *R.C. 4939.02(F) would restrict the constitutionally granted municipal powers of local self-government (narrowly construed) so that those powers would not include the power to regulate the use of public ways by utility service providers and cable operators when those parties would use the public ways for purposes of installing, maintaining, and operating their utility and cable equipment and facilities.*

{¶ 202} To fully comprehend the extent to which R.C. Chapter 4939 would divest municipalities of constitutionally granted powers, one has to consider how the various parts of the chapter work together.

{¶ 203} R.C. 4939.02(C) says:

{¶ 204} "Nothing in this section shall be construed to authorize any utility service provider or cable operator to construct lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities along, across, upon, and under any public way owned by a political subdivision without first obtaining the consent of the political subdivision for such construction, if consent is required by the political subdivision."

{¶ 205} By itself, this paragraph would appear to protect a municipality's power of control over its public-way property. However, a municipality's power to withhold consent is limited by R.C. 4939.02(F):

{¶ 206} "Consent for the use of a public way by a political subdivision shall be based on the lawful exercise of the police power of the political subdivision and shall not be unreasonably withheld, nor shall any preference or disadvantage be created through the granting or withholding of consent."

{¶ 207} This sentence might appear to require only that municipalities conduct themselves reasonably and lawfully. However, it actually does much more. It would prohibit the use of any municipal powers *other than* the police power to control the use of municipal public ways. Hence, R.C. 4939.02(F) would prohibit the exercise of any constitutionally granted municipal power of local self-government (narrowly construed) to control the use of municipal public-way property by cable operators and utility service providers.

*b. R.C. 4939.02(A) would restrict constitutionally granted municipal police powers and powers of local self-government so that those powers would not include any municipal control over the use of public ways by utility service providers and cable operators.*

■■■■■ {¶ 208} A careful analysis reveals that R.C. 4939.02(A) would further divest municipalities of their *constitutionally granted* local police powers to the extent that such powers might be employed to control the use of municipal public ways by utility providers and cable operators. If municipalities would be left with any local police power over such matters (a debatable issue), any remaining local police powers would, at most, be limited to those granted by the Revised Code.

{¶ 209} R.C. 4939.02(A), like R.C. 4939.02(F), would also divest municipalities of their *constitutionally granted* powers of local self-government (narrowly construed) to the extent that such powers might be employed to control the use of municipal public ways by utility providers and cable operators.

{¶ 210} Although R.C. 4939.02(F) says, "Consent for the use of a public way by a political subdivision shall be based upon the lawful exercise of the police

power of the political subdivision," R.C. 4939.02(A) proceeds to limit what will count as a "lawful" exercise of local police power. The first sentence of R.C. 4939.02(A) states:

{¶ 211} "A utility service provider or cable operator has the *right* to construct, repair, position, maintain, or operate lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities along, across, over, upon, and under any public way in the state, *subject to the applicable provisions of this chapter and any other chapter of the Revised Code.*" (Emphasis added.)

{¶ 212} This provision effectively prevents municipalities from conditioning their consent to use public ways on anything other than satisfaction of relevant Revised Code provisions. By declaring that utility service providers and cable operators have a right to occupy the public ways with their equipment and facilities so long as they satisfy any relevant provisions of the Revised Code, this section effectively requires that municipalities allow cable operators and utility service providers to occupy any public way with their equipment and facilities so long as they satisfy any relevant requirements of the Revised Code. This could be interpreted as prohibiting any and all municipal regulation of such matters. Alternatively, it could be interpreted as allowing that municipalities could regulate such matters but only to the extent that they rely upon *statutorily granted* municipal police powers.

{¶ 213} Under either interpretation, R.C. 4939.02(A) would prohibit reliance upon any municipal police power deriving directly from the Constitution or any municipal power of local self-government (narrowly construed) deriving directly from the Constitution. Even if R.C. 4939.02(A) is interpreted so as to preserve municipal police powers that have been granted by the Revised Code, the attempt to completely divest municipalities of their constitutionally granted powers of local self-government and constitutionally granted local police powers, insofar as either relate to the control over use of public ways by utility service providers and cable operators, is highly significant for home rule analysis. As stated by the Ohio Supreme Court in *Perrysburg,* a primary purpose of the Home Rule Amendment was to protect municipalities from having to rely upon the vicissitudes of the General Assembly to determine the scope of their powers. The experience of the state and its municipalities prior to the adoption of the Home Rule Amendment had proved that municipalities should not be subject to such reliance upon the legislature. Hence, it would be improper to determine that there is no harm in eliminating constitutionally granted municipal police powers so long as statutorily granted municipal police powers exist. The problem with mere statutory municipal police powers is that they are subject to the very vicissitudes of the General Assembly that the Home Rule Amendment was meant to neutralize.

*c. R.C. 4939.03(A) would eliminate any constitutionally granted municipal powers of local self-government relating to a municipality requiring compensation in return for use of its public ways by cable operators and utility service providers. R.C. 4939.03(A) would also eliminate any constitutionally granted municipal police powers relating to a municipality requiring compensation in return for use of its public ways by cable operators and utility service providers.*

{¶ 214} R.C. 4939.03(A) says:

{¶ 215} "A political subdivision of the state shall not levy a tax, fee, or charge or require any non-monetary compensation or free service for the right or privilege of using or occupying a public way for purposes of delivering natural gas, electric, telecommunications, or cable television service."

{¶ 216} Hence, R.C. 4939.03(A) prohibits municipalities from obtaining compensation, regardless of its nature, for the use of its public ways by utility service providers or cable operators. This raises the issue of whether the municipal power to require such compensation derives from the grants of municipal power set forth in the Home Rule Amendment.

{¶ 217} The municipal power to raise revenue has been determined to be a power of local self-government. *Cincinnati Bell Tel. Co. v. Cincinnati* (1998), 81 Ohio St.3d 599, 693 N.E.2d 212. Charging of fees has been held to fall within the local police power granted by the Home Rule Amendment. *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147; *Fondessy Enterprises, Inc. v. Oregon* (1986), 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797; *Portsmouth v. McGraw* (1986), 21 Ohio St.3d 117, 21 OBR 422, 488 N.E.2d 472. Under the circumstances of the current case, a municipal requirement that compensation be provided in return for use of municipally owned public ways would also fall within the powers of local self-government (narrowly construed). In *Ohio Assn.*, the fee was for purchase of a license to engage in a profession. In *Fondessy* and *McGraw*, the fee was to compensate the city for services. By contrast, in the current case, the fee is for use of municipal property. Since a municipality's control of its property falls within its powers of local self-government, its determination that it will not permit use of its property without reasonable compensation would also fall within its power of local self-government. Since control of municipal property can also fall within the local police power, this court finds that a municipality's requirement that it receive compensation in return for the use of its public ways could, in varying circumstances, be authorized by either or both constitutional grants of home rule power.

{¶ 218} In conclusion, R.C. 4939.03(A) would eliminate any constitutionally granted power of local self-government, or any municipal police power, that would permit a municipality to require compensation for the use of its public ways.

{¶ 219} Having found that R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) would eliminate any constitutionally granted powers that would otherwise authorize municipalities to control, and/or require compensation for, the use of their public ways, the next issue is whether the Ohio Constitution authorizes the particular limitations upon those constitutionally granted powers contained in those statutory provisions.

7. **The restriction against levying taxes in R.C. 4939.03(A) does not violate the Home Rule Amendment to the Ohio Constitution because the Ohio Constitution explicitly gives the General Assembly the power to limit municipal taxation. R.C. 4939.02(B) does not violate the Home Rule Amendment because discrimination against utility service providers and cable operators is a matter of statewide concern and the second half of R.C. 4939.02(B) merely reiterates appropriate constitutional standards. R.C. 4939.02(A), R.C. 4939.02(F), and the remainder of R.C. 4939.03(A) are unconstitutional because they limit constitutionally granted home rule powers in a manner not authorized by the Ohio Constitution.**

a. *There are only three kinds of limitations on home rule powers that the General Assembly is authorized to enact: (1) legislation pursuant to an expressly granted power to limit some specific exercise of municipal home rule powers, (2) legislation covering only those subject matters in which statewide concerns predominate over local interests, and (3) enactment of "general laws," since municipal police regulations cannot permit what a general law prohibits, or prohibit what a general law declares to be permitted. Any other attempt to limit municipal home rule powers violates the Home Rule Amendment.*

{¶ 220} Courts have only recognized three methods by which the General Assembly can validly limit the home rule powers granted to municipalities by the Ohio Constitution.

{¶ 221} First, there are specific provisions in the Ohio Constitution that explicitly authorize the General Assembly to limit specific municipal powers. For example, the Ohio Constitution has been found to authorize legislation limiting municipal powers with regard to taxation and public employment.

{¶ 222} Second, as discussed earlier, courts have found that the "powers of local self-government" (narrowly construed) are limited by the statewide-concern doctrine. The "powers of local self-government" granted by the Home Rule Amendment do not include the power to enact ordinances that conflict with state

law if the subject matter of the ordinance is one in which statewide concerns predominate over local interests.

{¶ 223} Third, the power to enact local police and similar regulations is expressly limited by the Ohio Constitution so that no local police, sanitary, or similar regulation may conflict with the "general laws" of the state. The term "general law" is a term of art that does not include every law that the General Assembly enacts.

{¶ 224} These are the only grounds upon which the General Assembly is authorized to enact legislation limiting municipal home rule powers. Defendant has not argued that any others exist or are applicable in this case. Hence, if any of the limitations on municipal powers found in R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) are not authorized on one of these three grounds, then that limitation violates the Home Rule Amendment to the Ohio Constitution and should be declared unconstitutional.

b. *The General Assembly is authorized by the Ohio Constitution to limit the municipal taxing power as it did in the first part of R.C. 4939.03(A).*

{¶ 225} R.C. 4939.03(A) says:

{¶ 226} "A political subdivision of the state shall not levy a tax, fee, or charge or require any non-monetary compensation or free service for the right or privilege of using or occupying a public way for purposes of delivering natural gas, electric, telecommunications, or cable television service."

{¶ 227} Section 13, Article XVIII of the Ohio Constitution says: "Laws may be passed to limit the power of municipalities to levy taxes." Hence, the Ohio Constitution allows the General Assembly to pass laws expressly limiting the power of municipalities to levy a tax even though the municipal power to levy taxes falls within the "powers of local self-government" provided by the Home Rule Amendment. *Cincinnati Bell Tel. Co. v. Cincinnati* (1998), 81 Ohio St.3d 599, 693 N.E.2d 212. Consequently, that part of R.C. 4939.03(A) that prohibits the levy of a tax by municipalities for the right or privilege of using or occupying a public way does not violate the home rule provisions of the Ohio Constitution.

{¶ 228} Having determined that the portion of R.C. 4939.03(A) prohibiting certain municipal taxes does not violate the home rule provisions of the Ohio Constitution, the court now turns to the question of whether the remainder of R.C. 4939.03(A), or any other provision of Chapter 4939, violates the home rule provisions.[12]

---

12. Ohio law distinguishes between the charging of a fee and the levy of a tax. *Wooster v. Graines* (1990), 52 Ohio St.3d 180, 556 N.E.2d 1163; *State ex rel. Gordon v. Rhodes* (1952), 158 Ohio St. 129, 48 O.O. 64, 107 N.E.2d 206.

*c. R.C. 4939.02(B) does not violate the home rule provisions of the Ohio Constitution because discrimination against utility service providers and cable operators is a matter of statewide concern, and because the second half of R.C. 4939.02(B) merely states a constitutional limitation upon police powers and powers of local self-government.*

{¶ 229} R.C. 4939.02(B) has two parts that will be considered in turn. The first part says:

{¶ 230} "(B) The state, or any political subdivision of the state, shall not discriminate among utility service providers or cable operators, or grant a preference to any utility service provider or cable operator, in the issuance of permits or the passage of laws, ordinances, or resolutions for the use of public ways."

{¶ 231} With regard to those telecommunications service providers who are included among the utility service providers and cable operators covered by Chapter 4939, this provision merely reiterates the requirement of federal law that municipalities not discriminate among telecommunications service providers. With regard to all of the utility service providers and cable operators covered by R.C. 4939.02(B), this court finds that municipal discrimination among such companies with regard to their access to the public ways is a matter of statewide concern. As noted above, the protection of consumers from the effects of allowing powerful monopolies to control utility markets has already been implicitly recognized by Ohio courts as a matter of statewide concern. Eliminating the municipal practices, such as the granting of exclusive utility franchises, that have led to the creation of such monopoly-controlled markets is one way of protecting consumers from such threats. The plaintiff municipalities in this case do not appear to be arguing that the elimination of such discrimination places any great burden upon them. The ban on discrimination cannot reasonably be interpreted as preventing a municipality from changing the requirements for entry upon its streets so that new entrants might have higher or lower requirements than had to be satisfied by those already occupying the streets.

{¶ 232} The second part of R.C. 4939.02(B) says:

{¶ 233} "(B) The state, or any political subdivision of the state shall not * * * create or erect any requirements for entry upon and use of the public ways that are not necessary to protect the health, safety, and welfare of the public."

{¶ 234} The purpose of this section appears to be to require that any municipal regulation of access to and use of public ways by utility service providers and cable operators be subject to the limitations that restrict the exercise of the police power. As stated by the Ohio Supreme Court:

{¶ 235} "[I]n order to be a valid exercise of the city's police power, the ordinance 'must directly promote the general health, safety, welfare or morals and must be reasonable, the means adopted to accomplish the legislative purpose must be suitable to the end in view, must be impartial in operation, must have a real and substantial relation to such purpose and must not interfere with private rights beyond the necessities of the situation.'" (Emphasis added.) *Hausman v. Dayton* (1995), 73 Ohio St.3d 671, 653 N.E.2d 1190.

{¶ 236} The requirement that an exercise of power "not interfere with private rights beyond the necessities of the situations" does not mean that police power can interfere with private rights only when such interference is absolutely necessary. Rather, the proper aim of a municipality is to determine "what legislation is reasonably necessary for the good and welfare of its community." *Cincinnati Motor Transp. Assn. v. Lincoln Hts.* (1971), 25 Ohio St.2d 203, 54 O.O.2d 317, 267 N.E.2d 797. The sense of necessity involved is not absolute necessity, but the constitutional sense by which "necessary" means "useful in accomplishing a permitted purpose." *Panhandle Eastern Pipe Line Co. v. Pub. Util. Comm.* (1978), 56 Ohio St.2d 334, 10 O.O.3d 452, 383 N.E.2d 1163.

{¶ 237} Since R.C. 4939.02(B) appears to be intended to reiterate the police power limitation, it is appropriate to construe the word "necessary" in that provision as having the same constitutional meaning. Thus, R.C. 4939.02(B) prohibits requirements only for entry upon and use of the public ways that would not be useful for the purposes of protecting the health, safety, or welfare of the public.

{¶ 238} Since R.C. 4939.02(B) merely reiterates the appropriate constitutional limitations on the exercise of the police power, R.C. 4939.02(B) does not limit the police power granted to municipalities by the Ohio Constitution.

{¶ 239} In addition, R.C. 4939.02(B) does not significantly limit a municipality's exercise of its powers of local self-government (narrowly construed). Those powers are limited by the same "reasonableness" requirement as the police power. In *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 748 N.E.2d 1111, the Ohio Supreme Court said:

{¶ 240} "It must be remembered that neither the state in the passage of general laws, nor the municipality in the passage of local laws, may make any regulations which are unreasonable. The means adopted must be suitable to the ends in view, they must be impartial in operation, and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation."

{¶ 241} The only requirement that R.C. 4939.02(B) adds is that the "ends in view" serve the health, safety, and welfare of the public. That would merely

seem to require that a municipality exercise its local powers of self-government for the benefit of the public. Such a restriction is already implicit in the Ohio Constitution's grant of powers of local self-government. Section 2, Article I of the Ohio Constitution states that "Government is instituted for [the people's] equal protection and *benefit*." (Emphasis added.)

{¶ 242} In conclusion, R.C. 4939.02(B) does not violate the Home Rule provisions of the Ohio Constitution.

*d. R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) are unconstitutional under the Home Rule Amendment to the Ohio Constitution because they would divest municipalities of powers of local self-government concerning certain subject matters in which local interests predominate over statewide concerns.*

{¶ 243} As discussed above, R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) would all prohibit municipalities from relying upon their *constitutionally granted* powers of local self-government (narrowly construed) to regulate, and charge a fee for, the use of municipal public ways by utility service providers and cable operators for purposes of installing and operating their equipment and facilities. Generally, the General Assembly is not authorized to prohibit municipalities from exercising their powers of local self-government (narrowly construed). However, nothing prevents the General Assembly from prohibiting municipalities from exercising their powers of local self-government on subject matters of statewide concern. Hence, in determining whether R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) unconstitutionally infringe upon municipal powers of local self-government (narrowly construed), the issue will be whether those sections of the Revised Code prohibit municipal regulation of any subject matter that falls within the municipal powers of local self-government (narrowly construed) and that is not subject to the supremacy of state law pursuant to the statewide-concern doctrine.

{¶ 244} The General Assembly declared its opinion at R.C. 4939.02(E):

{¶ 245} "The construction, repair, placement, maintenance, or operation of lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities by a utility service provider or a cable operator is declared to be a matter of statewide concern."

{¶ 246} The constitutional issue raised by this statutory paragraph is whether the General Assembly can eliminate municipal powers of local self-government merely by issuing such a declaration, or whether the Ohio Constitution would require this court to determine whether regulation of the subject matter does, in fact, affect the general public of the state more than the local inhabitants.

{¶ 247} The opinion of the General Assembly in matters that are ultimately subject to judicial determination cannot be regarded as determinative. *State ex rel. Shkurti v. Withrow* (1987), 32 Ohio St.3d 424, 513 N.E.2d 1332. The interpretation of the Constitution is a judicial, rather than a legislative, question. Id. The interpretation of the words "statewide concern" is a matter of constitutional interpretation, since those words, as used in the statewide-concern doctrine, are part of an interpretation of the Ohio Constitution. As discussed at length above, that doctrine and those terms involve a considerable ambiguity. Hence, the question of whether the subject matter of Chapter 4939 is a matter of "statewide concern" is a judicial question and it would be inappropriate to regard R.C. 4939.02(E) as determinative of the question.

{¶ 248} The power of ultimately determining whether a statute is constitutional belongs *exclusively* to the judicial branch of government. In *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, the Ohio Supreme Court said:

{¶ 249} " 'The people possessing all governmental power, adopted constitutions completely distributing it to appropriate departments.' *Hale v. State* (1896), 55 Ohio St. 210, 214, 45 N.E. 199, 200. They vested the legislative power of the state in the General Assembly (Section 1, Article II, Ohio Constitution), the executive power in the Governor (Section 5, Article III, Ohio Constitution), and the judicial power in the courts (Section 1, Article IV, Ohio Constitution). They also specified that 'the general assembly shall [not] * * * exercise any judicial power, not herein expressly conferred.' Section 32, Article II, Ohio Constitution.

{¶ 250} "The power and duty of the judiciary to determine the constitutionality and, therefore, the validity of the acts of the other branches of government have been firmly established as an essential feature of the Ohio system of separation of powers."

{¶ 251} If the power to ultimately determine whether legislation is constitutional belongs exclusively to the judicial branch, then so does the power to ultimately determine whether legislation satisfies the relevant constitutional standards. If R.C. 4939.02(E) was an attempt to ultimately determine the issue of whether the constitutional standard, in this case the "statewide-concern doctrine," was satisfied, it would be unconstitutional. Hence, in accordance with the rule that the legislation should be construed so as to be constitutional, it follows that R.C. 4939.02(E) should not be construed as being intended to ultimately determine the statewide-concern issue. It is more properly construed as merely identifying the General Assembly's rationale for Chapter 4939.

{¶ 252} It is especially clear in matters of home rule that the General Assembly should not be allowed to be the final arbiter of the extent of municipal

home rule powers, since, to do so, would defeat a primary purpose of the Home Rule Amendment, which was to free municipalities from such dependence upon the General Assembly.

{¶ 253} Even if it is assumed that considerable deference should be given to the General Assembly's declaration in R.C. 4939.02(E), this court finds, beyond a reasonable doubt, for the reasons which follow, that R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A) divest municipalities of powers of local self-government regarding regulation of certain subject matters that are not matters of statewide concern because regulation of those subject matters affects local inhabitants more than the general public of the state.[13]

{¶ 254} R.C. 4939.02(E) does not tell us why the things it lists are a matter of statewide concern. In particular it does not explain why such things would be a matter of statewide concern when they are being used only for delivery of services within the municipality.

{¶ 255} If one looks for the explanation in prior case law, one does not find it. As discussed above, prior precedents found statewide concerns sufficient to justify interference with the local municipal interests in controlling use of their streets by cable operators and utility service providers in only two kinds of situations: (1) regulation of intercity or interstate lines and related facilities, and (2) protecting consumers from the effects of allowing cable and utility markets to be controlled by powerful monopolies. Even when such statewide interests were being relied upon to expand statewide control over the installation of intercity and interstate power lines, municipal home rule powers over that particular subject matter was not entirely eliminated. Municipalities were allowed to retain some power to enact reasonable regulations concerning that subject matter. Furthermore, the state did not interfere with municipal regulation of the use of municipal streets for purposes of delivery of utility services within the municipality except when necessary to protect consumers from powerful monopolies.

---

**13.** It might be arguable that, since municipalities are to be regarded as having equal dignity with the General Assembly, no presumption should be exercised in favor of the General Assembly in this case, since such a presumption would be exercised against the municipalities who brought the case. Why would it be appropriate to assume that the municipalities who brought this action were any less interested in recognizing the appropriate constitutional limitations on their powers than the General Assembly was in recognizing the appropriate constitutional limitations on its powers when it enacted Chapter 4939? Should we not recognize equivalent conflicting presumptions in favor of both of these two governmental units of equivalent dignity? If so, would those competing equivalent presumptions not tend to cancel each other out? This court has not found any case where these questions have been explicitly posed. There have been cases wherein the general rule granting a presumption in favor of the General Assembly has been applied where the scope of home rule powers was at issue, but it is not clear that any of those courts considered whether that was appropriate in light of the equal dignity to be accorded to municipal governments.

{¶ 256} Unless there is some previously unidentified third basis for state regulation, one should expect that as monopoly-controlled markets are replaced by competitive markets, the statewide concern for regulating the use of municipal public ways for the purpose of local delivery of cable and utility services would contract rather than expand. This contraction would occur just as the local interests would be greatly increased because of the larger number of competing cable operators and utility service providers who want to install their equipment and facilities in and on municipal public ways. Consequently, one would expect that, if anything, the statewide-concern doctrine should lead to an expansion of the scope of the powers of local self-government as utility and cable markets become competitive rather than a contraction of those powers.

{¶ 257} Of course such expectations are dependent upon there not being some previously unidentified third basis for a statewide concern relating to regulating the use of municipal public ways. Hence, this court must consider whether the state has identified a credible third basis for statewide concern sufficient to justify the total elimination of the relevant powers of local self-government, especially as those concern control over the use of public ways where the use is for the purpose of delivery of *local* utility and cable services.

{¶ 258} In its brief, the state indicates that the purpose of Chapter 4939 is "not the regulation of streets, but the prohibition of discrimination among utility service providers in order to insure open competition and affordable public access." While it is true that R.C. 4939.02(B) requires that political subdivisions not discriminate among utility service providers or cable operators in the issuance of permits or the passage of laws, that is the only part of Chapter 4939 that is explicitly concerned with discrimination. The statewide concern for prohibiting discrimination does not provide any justification for eliminating a municipality's constitutionally granted powers enabling municipalities to pass reasonable regulations governing the use of, and the charging of fees for the use of, its municipal public ways. The state cannot claim that it is merely carrying out the federal nondiscrimination policy, since the Federal Telecommunications Act of 1996 prohibiting discrimination explicitly preserved "the authority of a state or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and non-discriminatory basis, for use of public rights-of-way on a non-discriminatory basis." This court finds that any statewide concern for the prevention of discrimination against particular cable operators and utility service providers is irrelevant to the question of whether there is a statewide concern adequate to justify the restriction on the powers of local self-government to enact reasonable, nondiscriminatory regulations governing the use of, and fees for use of, municipal

public ways by utility service providers and cable operators for purposes of installing and operating their equipment and facilities.

{¶ 259} Although Chapter 4939 is not limited to the regulation of telecommunication services, the state attempts to justify Chapter 4939 on the basis of a statewide concern relating to telecommunication services which the state argues has been recognized by the federal government and several other states who have enacted statutes governing the telecommunications industry. In its brief, the state says, "Chapter 4939 provides a comprehensive statewide scheme of ensuring the continued quality of telecommunication services while safeguarding the rights of consumers and competition in the market. Several other states have recognized this statewide concern and have enacted similar legislation." Then the state cites code sections from Arizona, California, Colorado, Iowa, Minnesota, and Nebraska.

{¶ 260} The description of Chapter 4939 as providing a "comprehensive" scheme for any of those purposes is incredible. For the most part, Chapter 4939 is not concerned with directly regulating quality of telecommunication services or the rights of consumers or competition in the market. Perhaps the state intends to argue that, by eliminating discrimination and lowering the costs of doing business in Ohio municipalities, competition will be fostered, and the "invisible hand" of competitive markets will bring about higher quality telecommunications and enhanced consumer rights. Once again, to the extent that the state is arguing for the existence of a statewide interest in prohibiting discrimination, that statewide interest is irrelevant to the issues of whether the General Assembly's intent to eliminate the constitutionally granted municipal powers to nondiscriminatively and reasonably regulate the use of municipal public ways by utility service providers and cable operators.

{¶ 261} Assuming that it is true that the cost of business might be reduced by reducing reasonable regulation and eliminating municipal fees, and that such a reduction in cost might lead to increased competition, is there a statewide interest in requiring that municipalities and their residents bear the costs, loss of revenue, and damages resulting from the municipality's loss of regulatory power, including the power to charge a reasonable regulatory fee? Consider the ways in which Chapter 4939 imposes such costs, loss of revenues, and damages.

{¶ 262} First, Chapter 4939 prohibits the collection of a reasonable regulatory fee. In Ohio, a reasonable regulatory fee is distinguishable from a tax. *State ex rel. Petroleum Underground Storage Tank Release Comp. Bd. v. Withrow* (1991), 62 Ohio St.3d 111, 579 N.E.2d 705; *State ex rel. Gordon v. Rhodes* (1952), 158 Ohio St. 129, 48 O.O. 64, 107 N.E.2d 206. Such a reasonable regulatory fee can include not only the costs of managing the use of public ways by telecommunications service providers but can also cover costs of providing

enhanced facilities for such use such as the enhanced facilities provided by Dublin in the current case, provided such enhancements are reasonable. *Gordon,* supra. While Chapter 4939 does allow some limited fees, those are not adequate to cover the full cost of managing the use of the public ways much less the cost of developing appropriate municipal facilities related to such use.

{¶ 263} A fee adequate to cover management of the facilities would include compensation for damage, and wear and tear, that results from the use of the street by utility service providers or cable operators. With regard to such matters, Chapter 4939 limits a municipality to seeking compensation when a utility service provider fails to return a street to its "prior condition of usefulness." Utility service providers and cable operators are not required by Chapter 4939 to return public ways to the condition they were in prior to the installation of their equipment. Municipalities can charge no more than is required to return the public way to its prior condition of usefulness.

{¶ 264} The power of local self-government which Chapter 4939 would eliminate might also be used to enact reasonable regulations to protect the aesthetics of municipal public ways from unreasonably nonaesthetic use of those public ways by utility service providers and cable operators. A municipality's concern for the aesthetics of its public ways is a significant interest. The Ohio Supreme Court has indicated that "there is a legitimate governmental interest in maintaining the aesthetics of the community" because "the appearance of a community relates closely to its citizens happiness, comfort and general well-being." *Hudson v. Albrecht* (1984), 9 Ohio St.3d 69, 9 OBR 273, 458 N.E.2d 852.

{¶ 265} By allowing for-profit businesses to forgo the reasonable costs of doing business, by requiring municipalities to bear the costs, loss of revenues, and damages resulting therefrom, Chapter 4939 effectively requires municipalities to subsidize the businesses of utility service providers and cable operators. Assuming that there is a statewide interest in providing such businesses with a subsidy, there is no statewide interest in requiring that municipalities bear the costs or other deleterious effects of such subsidies. In *Northern Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 15 O.O.3d 450, 402 N.E.2d 519, the Ohio Supreme Court refused to allow the state to saddle municipalities with an additional expense where the state had other, viable alternatives for accomplishing its goal. Hence, if the General Assembly believes that it is necessary to subsidize the for-profit businesses of utility service providers and cable operators in order to increase competition, then there is a statewide interest that such subsidy be provided by the state rather than being randomly distributed among the state's various political subdivisions (with varying abilities to afford such costs) based upon where and how various utility service providers might choose to provide their services. Hence, any statewide concern for

increasing competition is not a relevant basis for limiting the power of local self-government to reasonably, and nondiscriminatively, regulate the use of municipal public ways by cable and utility companies.

{¶ 266} It is of note that the other states defendant cites did not see it as necessary to enact the strict limits on constitutionally granted municipal powers set forth in the Chapter 4939. Arizona's statute indicates explicitly that it does not limit municipal authority to establish conditions for cable system licensing. It allows a "transaction privilege tax" on local and intrastate telecommunications services. The California statute cited by the state regulates only the amount of a permit fee, which it limits to the cost of the service provided. The Colorado statute, which explicitly preserves the constitutionally granted municipal police power, leaves open the possibility that a municipal government might refuse to grant a permit based upon regulations enacted pursuant to its constitutionally granted police power.[14] The Iowa statute, which concerns itself with defining the right of local governments to charge public utilities for the use of local rights-of-way allows those local governments to charge a fee that is adequate to recover their costs for managing the use of public rights-of-way. Alternatively, the statute permits local governments to charge public utilities a franchise fee. The Minnesota statute explicitly recognizes the power of local governments to manage their rights-of-way and to recover their management costs. The Nebraska statute explicitly recognizes municipal rights to regulate poles, wires, cables, and other appliances. It also recognizes the constitutional authority of municipalities to grant or deny consent for the use of public highways and requires only that such consent not be unreasonably withheld. Finally, the Nebraska statute explicitly permits a municipal "occupation tax" on a business. Since none of these statutes appears to go as far as the Ohio statute with regard to constricting constitutionally granted municipal powers, they do not provide evidence that there is a statewide concern in Ohio that would provide a basis for the sort of restrictions on constitutionally granted powers of local self-government attempted by R.C. 4939.02(A), R.C. 4939.02(F), and R.C. 4939.03(A).

---

14. The constitutionality of the Colorado statute was upheld in *Denver v. Qwest Corp.* (2001), 18 P.3d 748. The standard utilized was different from that in Ohio. There was no recognition of "powers of local self-government" (narrowly construed). Instead the court distinguished three types of subject matter: those involving only local interests, those involving only statewide interests, and those involving a mixture of interests. Under the Colorado home rule standard, local law is supreme only with regard to subject matters involving only local interests. In Colorado, the constitutional standard does not call for a balancing of the effects of regulation of the subject matter. Rather, if there is any admixture of statewide interests, state law controls. The court found that the Colorado telecommunications statute affected a mixture of local and statewide interests. The conclusion to be drawn is that home rule powers in Colorado are more narrowly circumscribed than those in Ohio.

{¶ 267} The state quotes the Colorado statute that says the following about its goals. The goals are "that all citizens have access to a wider range of telecommunication services at rates that are reasonably comparable within the state, that basic service be available and affordable to all citizens, and that universal access to advanced telecommunications services would be available to all consumers. Such goals are essential to the economic and social well-being of the citizens of Colorado and can be accomplished only if telecommunications providers are allowed to develop ubiquitous, seamless, statewide telecommunication networks."

{¶ 268} The word "essential" cannot reasonably mean "absolutely necessary." Hence, it would appear that the Colorado legislature meant that the goals are very important. Thus the consideration of those goals does not automatically exclude consideration of all other important goals affected by the regulation of the use of public ways by utilities service providers and cable operators.

{¶ 269} Whether a municipality permits a "seamless" telecommunications network is dependent upon how a municipality regulates intercity lines and facilities rather than upon how the municipality regulates lines and facilities dedicated to delivery of services within the municipality. The *Painesville* case provides precedent for recognizing a statewide interest with regard to intercity or interstate delivery of utility services. However, the *Painesville* case does not stand for the proposition that everything having to do with intercity and interstate lines and facilities is a matter of statewide concern. In upholding the statute in that case, the court specifically recognized that the statute preserved some municipal power to control the placement of such lines in order to conform to city planning. The importance of preserving such a power would be even more justified in the current case, which involves the public ways. Hence, while the statewide concern for allowing seamless telecommunications networks covers some subject matters relevant to regulation of use of public ways for intercity and interstate delivery of telecommunications services, it does not reach to all subject matters related to use of public ways for interstate and intercity delivery of services. It certainly does not reach so far as to justify the attempt in Chapter 4939 to completely eliminate the constitutionally granted power of local self-government (narrowly construed) to reasonably and nondiscriminatively regulate the uses of municipal public ways by utility and cable companies, and especially not where such use is for the purpose of delivery of local service.

{¶ 270} The Colorado legislature also suggests that telecommunication providers should be *allowed* to develop "ubiquitous" (that is, everywhere at the same time) telecommunication networks. Assuming this to be true, it does not justify the complete elimination of the power of local self-government to regulate the use of municipal public ways by telecommunication service providers

where that use is for the purpose of delivering telecommunications services within the municipality. That power, like all powers of local self-government, can only be exercised to enact *reasonable* regulations. *Froelich v. Cleveland* (1919), 99 Ohio St. 376, 124 N.E. 212; *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 748 N.E.2d 1111. No municipality could reasonably prohibit the local delivery of telecommunications services within the municipality. Given the federal law prohibiting discrimination against telecommunications providers, a municipality's power to regulate the use of its public ways by telecommunications service providers is limited to establishing reasonable, nondiscriminatory conditions for the use of those public ways and does not extend to prohibiting the use of those public ways (except perhaps in the situation where saturation has occurred, in which case, the statewide interest in ubiquitous telecommunications networks would be greatly reduced). Since the establishment of *reasonable* conditions for the use of public ways does not *disallow* development of ubiquitous telecommunications networks, the statewide interest that such networks should be allowed provides no justification for the elimination of the power of local state government at issue here.

{¶ 271} The Colorado legislature said that telecommunications services should be available at rates that are "reasonably comparable" within the state. It is true that if different municipalities set different reasonable conditions for the provision of telecommunication services, that this might cause variations in the rates charged in those various municipalities. However, rates are "reasonably comparable" if there is a reasonable basis for their variation. There is a reasonable basis for the variation where a municipality has enacted a reasonable regulation setting forth a reasonable condition for use of its public ways. To hold otherwise would be to hold that we value uniformity over autonomy. It is, after all, the local inhabitants, who have democratically elected their local legislative authority, who will experience the higher rates when their legislative authority, in balancing local priorities, determines that establishing some reasonable condition for the use of municipal streets is worth any resulting increase in local rates.

{¶ 272} The Colorado legislature says that basic telecommunications service should be available and affordable to all citizens. Since there are people in Ohio who cannot afford food and shelter, it would be impossible to make basic telecommunications services affordable to all citizens short of making such services free. There are no provisions in Chapter 4939 designed to accomplish that goal. However, it is arguable that Chapter 4939 is designed to make basic service affordable to more citizens of the state. Specifically, it can be argued that the cost of doing telecommunications business would be reduced if municipal regulation of that business were reduced and if the power of municipalities to

charge fees were reduced. Such lower costs *might* be passed on to consumers in the form of lower rates.

{¶ 273} However, once again, this is an argument that municipalities should be required to subsidize the for-profit businesses of cable and utility companies by eliminating their reasonable costs of doing business and placing the burden on the municipality by requiring it to forgo exercise of its regulatory powers for the protection of municipal property and municipal landscapes, and of charging a reasonable regulatory fee. Once again, if there is a statewide interest in providing such companies with a subsidy, there is no statewide interest in requiring Ohio's municipalities to bear the burden of that subsidy in the form of increased costs, lost revenues, damage to municipal property, and loss of quality of life.

{¶ 274} Finally, the Colorado legislature identified universal access to both basic and advanced telecommunication services as a statewide goal. As already discussed above, municipalities, who are subject to the federal nondiscrimination requirement, and whose powers of local self-government are limited to the enactment of *reasonable* regulation, already lack the power to prohibit the use of their public ways by telecommunication service providers. Hence, the only issue is whether, and to what extent, the reasonable municipal regulation of the use of public ways affects universal availability of telecommunication services.

{¶ 275} With regard to universal availability of such services outside a municipality, the state cites *Hawarden v. U.S. West Communications, Inc.* (Iowa 1999), 590 N.W.2d 504, and *AT & T v. Arlington Hts.* (1993), 156 Ill.2d 399, 189 Ill.Dec. 723, 620 N.E.2d 1040. These cases involve the attempt of municipalities to charge telephone companies a toll wherever their intercity lines cross through a municipal public way. It is important to note that both courts recognized the rights of municipalities to charge a reasonable regulatory fee for the use of their public ways. In both cases, the courts found that the proposed toll was a tax rather than a regulatory fee. The courts indicated that municipalities in their states had the authority to charge a regulatory fee but not to levy a tax upon the use of public ways. Hence, neither of those cases supports the state's notion that a statewide interest in universal access to telecommunication services outside a municipality justifies the elimination of a municipality's power of local self-government to charge a reasonable regulatory fee for the use of its public ways by utility service providers and cable operators.

{¶ 276} In any event, the issue of universal availability of telecommunication services outside a municipality is not significantly affected by a municipality's regulation of the use of its public ways by its utility service providers and cable operators where that use is limited to the delivery of local services within the municipality. To the extent there is a statewide interest in maximizing universal

availability outside the municipality, there is no statewide interest in requiring the municipality to bear the burden of such subsidies. As noted above, the attempt of Chapter 4939 to restrict the exercise of powers of local self-government extends even so far as to prohibit the use of those powers to regulate the use of municipal public ways where the use is solely for purposes of delivering cable and utility services within the municipality.

{¶ 277} The final issue is whether a statewide concern for ensuring universal access within any particular municipality is an adequate constitutional basis for excluding, from that municipality's powers of local self-government, the power to enact reasonable, nondiscriminatory regulations concerning the use of its municipal public ways by cable operators and utility service providers where that use is for the purpose of delivery of local services within the municipality.

{¶ 278} To the extent that regulation affects the availability of cable or utility services within a municipality, the effect is primarily an effect upon the local inhabitants in the municipality rather than upon the general public of the state. If there are any effects on the general public of the state they are probably limited to indirect economic effects, and in the case of utility and cable services which involve two-way communication, the general public would lose some of its means of communicating with persons who would otherwise have utilized their access to such services. If the review is limited to considering only these effects, the effects on local inhabitants are greater than the effects upon the general public as a whole. However, the certainty that local effects predominate over statewide effects is greatly enhanced when one considers the other effects of adjusting or eliminating the regulation of municipal public ways in order either to increase or decrease the universal availability of services within the municipality. This is true whether the state attempts to affect universal service within a municipality by limiting municipal regulatory powers, or whether the municipality itself directly attempts to affect universal access within the municipality through its regulations.

{¶ 279} When the state attempts to ensure universal access in the municipality merely by reducing municipal regulatory powers, there is a very important local effect upon the local inhabitants: loss of local autonomy. Local inhabitants lose the power that they have within the municipality to affect that municipality's exercise of its powers of local self-government. They lose the power to affect how their priorities would be reflected by municipal regulations.

{¶ 280} On the other hand, if the matter is left to municipal regulation, the municipality might seek to protect the appearance of its public ways by strictly regulating installation of utility equipment, cables, etc., in a manner designed to minimize negative aesthetic effects and maximize positive aesthetic affects. The municipality might seek to minimize its own street repair costs by strictly

regulating the installation of such equipment with regulations designed to minimize damage to the streets and/or require full compensation for any such damage. The municipality might also seek to exercise its right as a property owner to receive a reasonable, nondiscriminatory regulatory fee in return for the use of municipal property.

{¶ 281} But insofar as the municipality chooses to pursue any of those goals, it will probably increase the costs that will be incurred by utility service providers or cable operators who choose to provide services in the municipality. That may reduce the number and variety of utility and cable services that companies would then be willing to offer to local residents and businesses and/or it might lead to increased charges for such services. That, in turn, might adversely affect commercial development in the community in a manner that might erode the municipality's tax base and/or negatively affect the cost and/or quality of life for local residents.

{¶ 282} But it is also possible that the positive effects of stricter regulation and reasonable fees, enhancing the aesthetics and quality of life in the community, reducing interference with other uses of public ways and damages to public ways, improving municipal finances, and providing for more efficient delivery of cable and utility services, might positively affect commercial and residential development in a manner that might offset the negative affects, thereby positively affecting the municipality's tax base and the cost and quality of life for local residents, not to mention that enhanced commercial and residential development might just happen to attract more cable and utility services.

{¶ 283} Hence, any municipality will be faced with a question of how it will prioritize the various factors. It may or may not regard minimizing the cost of utility and cable services to local residents, and maximizing the variety and number of providers, as its paramount interest. But, in any event, the effects of those municipal decisions, insofar as they concern utility service providers and cable operators who want access to the public ways for purpose of providing services to local residents and businesses, will be predominantly local effects.

{¶ 284} This court finds that it is beyond a reasonable doubt that, by eliminating constitutionally granted powers of local self-government (narrowly construed) with regard to controlling use of municipal way property, Chapter 4939 goes far beyond what is justified under the statewide-concern doctrine.

{¶ 285} The first sentence of R.C. 4939.02(A), the first sentence of R.C. 4939.02(F), and R.C. 4939.03(A) (except for the prohibition on a levy of tax) are hereby found to be unconstitutional, as applied to Ohio's municipalities, under the Home Rule provisions of the Ohio Constitution.

{¶ 286} This court does not mean to imply that the results could not be different if the state had enacted a truly comprehensive scheme that adequately protected both state and local interests. So, for instance, this decision is not meant to preclude some statewide scheme that might extend a system of conduits like Dublin's across the state in order to provide for a competitive market of truly seamless, ubiquitous utility and cable services across the state at a reduced burden to municipalities, if that be in the statewide interest of Ohio's citizens. The difference between an acceptable scheme and Chapter 4939 would be that an acceptable scheme would not simply ignore local interests and would instantiate a genuine concern for retention of at least enough local autonomy under the Constitution to deal with the issues that municipalities are left burdened with under the scheme. The state can affect a court's determination under the statewide-concern doctrine by enacting measures that alleviate local concerns.

e. *R.C. 4939.02(A) and R.C. 4939.03(A) are not "general laws," and consequently, their attempted limitation of the municipal exercise of constitutionally granted local police powers violates the Home Rule Provisions of the Ohio Constitution.*

{¶ 287} Defendant suggests that the provisions of Chapter 4939 are "general laws" and that municipal regulation of public ways is an exercise of the municipal police power. Defendant argues that, since the Home Rule Amendment explicitly requires that exercise of the municipal police power be consistent with general laws, that amendment implicitly authorizes the restrictions upon the municipal police power that are found in Chapter 4939.

{¶ 288} The argument is not persuasive. As explained above, R.C. 4939.02(A) and R.C. 4939.03(A) are the two paragraphs in Chapter 4939 that would limit municipal exercise of constitutionally granted local police powers. Defendant's argument fails because R.C. 4939.02(A) and R.C. 4939.03(A) are not general laws.

{¶ 289} The syllabus of *W. Jefferson v. Robinson* (1965), 1 Ohio St.2d 113, 30 O.O.2d 474, 205 N.E.2d 382, states:

{¶ 290} "The words 'general laws' as set forth in Section 3 of Article XVIII of the Ohio Constitution means statutes setting forth police, sanitary or similar regulations and not statutes which purport only to grant or to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations." Followed recently in *Linndale v. Ohio* (1999), 85 Ohio St.3d 52, 706 N.E.2d 1227.

{¶ 291} In developing the rule, the Supreme Court quoted at length *Youngstown v. Evans* (1929), 121 Ohio St. 342, 168 N.E. 844, which characterized the distinction as one between a law "prescribing a rule of conduct upon citizens generally" and a law that is a "limitation upon lawmaking by municipal legislative

bodies." The distinction appears to be based upon whether a law regulates a citizen or a municipal government. In *Evans,* the court determined that a law that limits municipal lawmaking, but does not generally regulate the conduct of citizens, is not a "general law" for purposes of the Home Rule Amendment. In making that determination, the *Evans* court relied upon a thought experiment that is quoted in *West Jefferson.* The thought experiment refers to "Section 3628," which was an Ohio statute setting limits upon penalties that could be imposed by municipal ordinance for misdemeanors:

{¶ 292} "The validity and scope of Section 3628 may properly be tested by supposing an extreme case. Let it be supposed that it provided for a complete prohibition upon municipal legislation. Manifestly such a law would not be effective to take away the power conferred upon municipalities by the plain provisions of the Constitution. Or let it be supposed that Section 3628 provided that municipalities should not impose any fine in excess of one dollar for violation of any police or sanitary ordinance and that it prohibited punishment by imprisonment altogether. No one would contend that such an indirect effort would be in any wise different in effect from a plain prohibition."

{¶ 293} Consideration of the methodology of this experiment reveals the rationale for the rule, as initially applied in *Evans,* but more recently formulated in *West Jefferson.* Since both courts regarded the thought experiment as persuasive, they were basing their adoption and formulation of the rule on the principle that the definition of "general law" should not be so broad that the supremacy of general law would provide the General Assembly with power adequate to do what is "manifestly unconstitutional": eliminate all municipal police power. The courts' idea of "manifest unconstitutionality" is probably best explained as the notion that the people of Ohio would not make anything subject to constitutional protection unless they valued it very highly. Hence, they would not intend that constitutional protections fail except, perhaps, under circumstances giving rise to an extremely strong justification for a different result. The justification would have to be strong enough to make us uncertain that the constitutional protection was intended to be effective in such circumstances.

{¶ 294} Since the rule in *West Jefferson* appears to have been based upon the notion that the term "general laws" should be defined so as to ensure that the General Assembly is not authorized by the Constitution to effectively eliminate municipal power in circumstances in which such elimination would be "manifestly unconstitutional," that rationale should be employed when interpreting the rule.

{¶ 295} The first question pertaining to interpreting the rule has to do with the meaning of the word "purport." Two alternative interpretations of the rule are:

{¶ 296} " 'General laws' do not include laws which, in explicit terms, only grant or limit the municipal police power.

{¶ 297} " 'General laws' do not include laws which are intended only to grant or limit the municipal police power." See Wilson, Kenneth The Columbia Guide to Standard American English (1993, Columbia University Press), at www.bartleby.com, in support of the possibility that purport means "intended."

{¶ 298} That question is relevant in this case because R.C. 4939.02(A) does not explicitly limit municipal power to regulate the use of public ways by cable operators and utility service providers. Rather, it merely confers a right on such companies to use and occupy the public ways. It subjects that right only to the requirements of the Revised Code. While R.C. 4939.02(A) does not explicitly limit the constitutionally granted municipal police power, anyone who understands the concept of a right and understands that constitutionally granted municipal police powers provide a source of regulation that is separate from the Revised Code will understand that R.C. 4939.02(A) is intended to prohibit municipal police regulation of the subject matter so long as such regulation is based upon the constitutionally granted police power.

{¶ 299} Applying the method utilized in *Evans* and *West Jefferson,* we should consider the following thought experiment. Suppose a statute granted to all persons a right to do whatever they wished and made that right subject only to the Ohio Revised Code. Such a statute, if valid, would eliminate municipal police powers just as effectively as the hypothetical statutes considered by *Evans* and *West Jefferson.* Hence, the statute would be manifestly unconstitutional (assuming, as was apparently assumed in those cases, no highly unusual situation providing an extraordinary justification for the General Assembly).

{¶ 300} Therefore, the *West Jefferson* rule should be interpreted to mean that "General laws" do not include laws which *are intended* only to grant or limit the relevant type of municipal power. R.C. 4939.02(A) does not become a general law merely because it uses the language of rights instead of asserting an express prohibition against the exercise of municipal powers.

{¶ 301} The next question pertaining to the interpretation of the *West Jefferson* rule has to do with the meaning of the word "only." Here there are three possible interpretations.

{¶ 302} "General laws" do not include laws which are intended to grant or limit the municipal police power unless the General Assembly also has some valid police power purpose.

{¶ 303} "General laws" do not include laws which are intended to grant or limit the municipal police power unless the General Assembly also has some valid

police power purpose which justifies at least part of the intended limitation on municipal police power.

{¶ 304} "General laws" do not include laws which are intended to grant or limit the municipal police power unless the General Assembly also has some valid police power purpose which justifies the entire intended limitation on municipal police power.[15]

{¶ 305} Applying the thought-experiment method, under either of the first two interpretations of the *West Jefferson* rule, "general law" would be defined in such a way that the General Assembly could effectively eliminate municipal police power under conditions where it would be manifestly unconstitutional to do so. While the third would also leave open the possibility that the General Assembly could use general law to eliminate municipal police power, the General Assembly would be authorized to do so only if such elimination was fully justified. Hence, such elimination would not be manifestly unconstitutional.

{¶ 306} Thus, of these three interpretations of the *West Jefferson* rule, the third is preferable when subjected to the thought-experiment method utilized by *Evans* and *West Jefferson*. Hence, this court interprets the *West Jefferson* rule as follows:

■ {¶ 307} "The words 'general laws' as set forth in Section 3 of Article XVIII of the Ohio Constitution means statutes setting forth police, sanitary or similar regulations and not statutes [that are intended] to grant or to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary, or other similar regulations," unless the General Assembly also has some valid police power purpose which justifies the entire intended limitation on municipal police power. *West Jefferson* at paragraph three of the syllabus.

■ {¶ 308} For purposes of review by a court, the last clause will be regarded as satisfied if the restrictions on municipal legislation concern matters of statewide concern. Beyond that, the court's review would probably be limited to considering police power requirements of reasonableness and proper purpose.

■ {¶ 309} One more question of interpretation remains to be answered by the *Evans* and *West Jefferson* thought-experiment method. Does a statute which is intended to limit the police powers of all subdivisions have the requisite uniformity so to fall under the police regulation category, or is it still a statute

---

**15.** The word "only" can refer to the absence of any second purpose, or it can refer to the separateness of an independent purpose which is not dependent upon some other purpose. Finally, where the act of limiting municipal power can be divided into parts, and part is done for the sake of some proper police power purpose, but part is not done for a police power purpose, then the second part is "only" done for the purpose of limiting municipal power.

intended to limit the police powers of a municipal corporation which happens also to be intended to limit the powers of other subdivisions. Using the *Evans* terminology, is the statute a law "prescribing a rule of conduct upon citizens generally" or a law that is a "limitation upon lawmaking by municipal legislative bodies."

{¶ 310} If such a law is determined to fall into the first category and is therefore classified as a "general law," then "general law" would be defined in such a way that the General Assembly would have the authority to do what is "manifestly unconstitutional": eliminate all municipal police power merely by doing the same to all other subdivisions. Such a result precludes defining the requisite "uniformity" in that way.

{¶ 311} Applying the rule from *West Jefferson*, as interpreted above, this court finds that R.C. 4939.02(A) and R.C. 4939.03(A) are not "general laws."

{¶ 312} The first sentence of R.C. 4939.02(A) states:

{¶ 313} "A utility service provider or cable operator has the *right* to construct, repair, position, maintain, or operate lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities along, across, over, upon, and under any public way in the state, *subject to the applicable provisions of this chapter and any other chapter of the Revised Code.*" (Emphasis added.)

{¶ 314} The right described in this provision is made conditional only upon satisfaction of any relevant requirements of the Revised Code. As already stated above, R.C. 4939.02(A) is intended to limit the exercise of constitutionally granted municipal police powers. It does not become a state police regulation merely because it uses the language of rights rather than using more direct language prohibiting the exercise of constitutionally granted municipal police powers.

{¶ 315} R.C. 4939.03(A) explicitly limits exercise of a municipal police power relating to charging a reasonable regulatory fee.

{¶ 316} As noted above, a statute that limits the exercise of municipal police power such as R.C. 4939.02(A) or 4939.03(A), does not become a "general law" merely because it is framed so as to apply to all subdivisions.

{¶ 317} Finally, as was discussed above with regard to the application of the statewide-concern doctrine, the General Assembly does not have a statewide concern that is adequate to transfer a large part of the subject matter of Chapter 4939 to the state.

{¶ 318} Hence, this court finds that R.C. 4939.02(A) and R.C. 4939.03(A) do not satisfy the requirements for being "general laws" under the rule from *West Jefferson*. Other cases have found that statutory provisions which do not satisfy the requirements of that rule by themselves are nevertheless elevated to the

status of "general laws" by way of some relation to other statutory provisions that are general laws. The most recent of these cases suggest merely that if a law is not a general law under *West Jefferson,* then one should determine whether the statutory scheme within which it is included is general law. But these cases fail to clarify the basis for determining that a non-general provision is "included in" a statutory scheme that is general law. In *Garcia,* the court recognized that mere inclusion in the same chapter or section of the Revised Code is insufficient. The court refused to regard certain non-general statutory provisions located in the same chapter or section as being part of the same statutory scheme, noting that the non-general provisions were not "reasonably related to the valid purposes and objectives of the regulatory and licensing portions" of that chapter of the Revised Code. *Fondessy,* infra, has provided the fullest account of the proper relationship needed between an otherwise non-general statute and other general statutes in order to transform the former into a "general law." *Fondessy* has never been overruled and having more carefully considered the issue than any other case since, it would appear that *Fondessy* remains the law of Ohio.

{¶ 319} Defendant argues that a statutory provision that limits municipal power may become a "general law" if "the state comprehensively regulates the subject matter governed by the state statute." Even if that were the law, which, for reasons discussed below, it is not, the state does not comprehensively regulate the subject matter of Chapter 4939: the use of public ways by utility service providers and cable operators for purposes of occupying those public ways with their equipment and facilities in the context of new competitive markets for cable and utility services.

{¶ 320} Defendant does not identify any comprehensive legislative scheme beyond Chapter 4939, but instead insists that Chapter 4939 is itself a comprehensive scheme. This court is unpersuaded. Chapter 4939 does not begin to regulate all of the multitudinous issues existing within this subject matter. It is actually unclear whether Chapter 4939 is meant to totally displace all municipal regulation of the subject matter, including regulation pursuant to statutorily granted authority, or whether it is meant only to displace regulation pursuant to constitutionally granted authority. If the latter, Chapter 4939 does not provide a comprehensive uniform regulatory scheme, because it leaves most of the issues to be resolved by local government. If the former, then Chapter 4939 is not comprehensive, because it fails to provide for all of the issues previously regulated by local government. Some, but not all, of the issues not regulated by Chapter 4939 would be as follows:

{¶ 321} 1. Aesthetics: This issue should not be underestimated. In *Hudson v. Albrecht* (1984), 9 Ohio St.3d 69, 9 OBR 273, 458 N.E.2d 852, the Ohio

Supreme Court said, "[T]he appearance of a community relates closely to its citizens' happiness, comfort and general well-being. Accordingly, it is our finding that there is a legitimate governmental interest in maintaining the aesthetics of the community." This is an issue which is usually left to local governments, and it is difficult to comprehend how it might be regulated competently to any degree of detail by the state.

{¶ 322} 2. Organization of installation: How are conflicts between different uses of public ways to be resolved? Who controls scheduling of installation of various equipment and what principles are to be employed in the scheduling? How is one company's equipment to be protected when another company installs its own? Who gets to install their equipment when one company's equipment is of a kind that cannot be installed close to the equipment of another company? Is there a point at which a public way should be regarded as saturated? Where in a right-of-way should various kinds of equipment be installed? What records and maps need to be made of the equipment installed? Can a municipality require use of its own conduits and other equipment, and under what circumstances?

{¶ 323} 3. Costs: What is the state going to do to shoulder the burden of the added costs and deleterious consequences of requiring Ohio's municipalities to effectively subsidize private, for-profit businesses with below-cost access to municipal public ways without even so much as a requirement that those public ways be returned to their same prior material condition?

{¶ 324} 4. Removal of equipment: Are companies to be allowed or required to remove their equipment when their services cease? Who pays for such removal, if needed, if a multitude of fly-by-night companies experience bankruptcy? What if equipment once thought safe is later determined to be unsafe?

{¶ 325} 5. Reliability: Now that the providers of services are not necessarily going to be well-established public utility monopolies, are there any standards of reliability that should be imposed as to finances, engineering competence, and services before we allow our public ways to be occupied if proper occupation of public ways requires some expertise and is not easily reversible? Should there be bonding requirements?

{¶ 326} This court finds that Chapter 4939 is not a "comprehensive" legislative scheme. However, even if it were, mere inclusion in a comprehensive legislative scheme is not determinative of whether a statute attempting to preempt municipal legislation on the subject matter of the statutory scheme is a "general law." Defendant's citation of *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278, appears to be the legal authority for defendant's argument. *Clermont* was later clarified by the Ohio Supreme Court in *Fondessy Enterprises, Inc. v. Oregon* (1986), 23

Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797. Pursuant to that clarification, *Clermont* can no longer be interpreted as supporting defendant's position.

{¶ 327} In *Fondessy*, the court indicated that a statute is unconstitutional if it attempts to expressly preclude all municipal legislation relating to the subject matter. In other words, a statute is unconstitutional if it attempts to forbid a municipality from enacting police, sanitary, or similar regulations pertaining to a particular subject matter *merely because* the state has "occupied the field" with a comprehensive regulatory scheme. What the General Assembly can do when it has enacted a permit or licensing scheme, or has otherwise granted permission for the performance of some act, is clarify its own intentions as to whether the permit, license, or permission is intended to be absolute or conditional upon compliance with municipal requirements or some specified subset of municipal requirements.

{¶ 328} One way the General Assembly can clarify whether its permission is conditioned upon obtaining municipal permission or satisfying some other municipal requirement is by indicating the extent to which municipalities may continue to require that their permission be obtained, or require any other act prior to doing that which the statute, state permit, or state license permits. Such a statutory provision identifying what a municipality is permitted to continue to require does not independently limit municipal power, but, rather, by clarifying the scope of the statutory permission, state permit, or state license, it merely identifies the limit on municipal power that is entailed by the combination of the statutory permission, state permit, or state license on the one hand, and the constitutional requirement that municipalities may not enact police, sanitary, and similar regulations that conflict with such statutory permission, state permit, or state license.

{¶ 329} It must be noted that in order for a statutory provision to perform this function of merely identifying what sort of ordinances are precluded by the Constitution itself, the provision must function as a clarification of another separate statutory provision, which is itself a general law, and which either directly grants permission to perform a certain act, or establishes a state licensing or permit scheme. As applied to the current case, neither R.C. 4939.02(A) nor R.C. 4939.03(A) functions as clarifying some other general law statutory provision granting permission to perform some act, or establishing a state licensing or permit scheme. Consequently, pursuant to *Fondessy*, R.C. 4939.02(A) and R.C. 4939.03(A) are unconstitutional attempts to explicitly preempt municipalities from the exercise of the power granted to them by the Ohio Constitution to enact and enforce police, sanitary, and similar regulations that do not conflict with general laws.

## Conclusion

{¶ 330} Plaintiffs' summary judgment motion is GRANTED. Defendant's summary judgment motion is DENIED. The court hereby DECLARES as follows:

{¶ 331} 1. Chapter 4939 is unconstitutional under the Single–Subject Rule of the Ohio Constitution.

{¶ 332} 2. Chapter 4939 does not violate the uniformity requirement of the Ohio Constitution.

{¶ 333} 3. The first sentence of R.C. 4939.02(A), the first sentence of R.C. 4939.02(F), and R.C. 4939.03(A), except for the prohibition of a levy of a tax, are unconstitutional under the Ohio Constitution. R.C. 4939.01, the second sentence of R.C. 4939.02(A), and all of R.C. 4939.02(B) are severable from the provisions that violate the Home Rule Amendment and do not themselves violate that amendment. In reaching this last conclusion, the word "necessary" in R.C. 4939.02(B) is construed as meaning "useful for a permitted purpose." The remaining provisions of Chapter 4939 are not severable.

{¶ 334} 4. In view of this court's above declarations, the question of whether Chapter 4939 violates the Takings Clause of the United States Constitution is moot.

{¶ 335} Counsel for plaintiffs shall submit a final judgment entry pursuant to Local Rule 25.01.

Judgment accordingly.